Shirley A. KAUFMAN, Petitioner,

v.

Louis S. MILLER, Respondent.

No. A–11730.

Supreme Court of Texas.

April 19, 1967.

John H. Benckenstein, Beaumont, for petitioner.

John T. Lindsey, Port Arthur, Payton R. Covington, Lake Charles, La., for respondent.

CALVERT, Chief Justice.

This is a suit for damages for personal injuries brought by Louis S. Miller, who

will be referred to in this opinion as plaintiff, against Shirley Kaufman, to be referred to as defendant. The suit grew out of a motor vehicle collision on July 15, 1961. The case was submitted to a jury on a number of special issues. Based on the jury's verdict, the trial court rendered judgment awarding the plaintiff a recovery of $25,000. The court of civil appeals affirmed. 405 S.W.2d 820. We reverse the judgment of the courts below and here render judgment that the plaintiff take nothing.

Defendant argues under her first point of error that as a matter of law the evidence will not support the jury findings that her negligent acts or omissions were proximate causes of the plaintiff's injuries. In evaluating this argument, it should be stated at the outset that the evidence establishes conclusively that there was no physical impact with the plaintiff's body in the collision and that the only injury suffered by him was an injury to his nervous system, diagnosed by his psychiatrist-witness as a "conversion reaction" and "compensation neurosis." A summary of the relevant evidence, viewed most favorably in support of the verdict, is necessary to put the question of proximate cause in proper perspective.

Between the hours of 2:30 and 3:00 o'clock, p. m., July 15, 1961, plaintiff was driving through Beaumont, Texas on IH–10, a four-lane divided highway with two lanes for traffic moving westerly and two lanes for traffic moving easterly. Plaintiff was traveling in the south lane of eastbound traffic, returning to Louisiana from Texas City, Texas. He was driving an International 220 truck with an empty tank-trailer which was used to transport gasoline or chemicals. The truck-trailer had an overall length of approximately fifty feet, and it weighed 72,000 pounds when the tank-trailer was full and 25,000 pounds when the tank-trailer was empty.

Pine Street in Beaumont enters IH–10 from the south at a 45° angle, some ten feet west of the west end of a bridge over the Neches River. Plaintiff's truck was passing the Pine Street entrance when the defendant sought to enter the highway and drove her Plymouth automobile against the rear wheel of the trailer. The force of the collision threw the defendant's automobile against the bridge railing. The damage to the automobile was insubstantial and no damage was done to the truck. Both vehicles later left the scene of the collision under their own power, and both drivers proceeded to their respective destinations in Louisiana.

Defendant had her mother and her aunt as passengers in her car. Plaintiff saw the car approaching on Pine Street but did not see it as it entered the highway. He did not know it had collided with his trailer. He "heard a little crash" which required him to use some effort to keep the truck under control, but he thought he had hit the curb of the bridge. He looked in his rear view mirror and saw the car against the bridge railing and then knew "that I had either hit her or she hit me." He stopped his truck some 150 feet from the place of collision and walked back to investigate.

When plaintiff reached the car, he found the three women. He was nervous. Defendant was nervous, excited and "shook up," but no one appeared to have been injured. Plaintiff discovered that his truck and trailer were undamaged, and he told the defendant he was not hurt. He testified, however, that he got "shocked" and "shook up at the accident." In his testimony he accounted for his shock thusly: "I didn't even know that I had hit her, for one thing, and that's what shook me up—or she hit me. When I went over there she told me that I had run into her and that's what got me all shook up, then, and shocked." He sent in an accident report to his employer in which he stated that he had received no injuries in the collision.

"Right after" the collision, the plaintiff began to have spells of nervousness and

dizziness and blackout spells. He would have dizzy spells when he got nervous, and he would get nervous because he "was scared somebody would run into" him and was afraid he "might hurt somebody." His dizzy spells did not get "real bad" until about the time he went to see a doctor in May, 1962, some ten months after the collision. By that time, he was having nightmares and spells of nausea. His doctor would not let him go back to driving a truck. He consulted several doctors and was hospitalized for a week. From May, 1962 until the time of the trial in April, 1965, plaintiff had worked at various jobs at a considerable loss of earnings. His dizzy spells were less frequent at the time of trial.

Plaintiff is a son of farmer parents who separated when he was fourteen years old. He received an eighth grade education. He remained on the farm with his father until he was seventeen, at which time he went into the military service where he remained for six years. While in the army, he was a heavy truck driver, and, with study, achieved the equivalent of a tenth grade education. He left the military service in 1955, went to a mechanic's school for one year and then got a job driving a truck. He worked for various employers in different kinds of employment before he secured work as a truck driver with Herring Tank Lines for whom he was working at the time of the collision on July 15, 1961. He was 31 years of age at the time of trial. He could remember having had only one dizzy spell before the collision and that was on an occasion when he was doing off-shore work and "the heat hit" him.

The plaintiff had been in other accidents prior to the collision, only one of which needs to be noticed. In May, 1959 he had a serious accident. He hit a hole in the highway and broke the left front frame on his truck, causing the truck to jack-knife and turn over and catch fire at a trailer camp. One trailer house burned down and three occupants of it died in the fire. Two or three other trailer houses and a nearby residence and garage burned down. The plaintiff admitted that the accident was a "horrible" one, he suffered a severe shock from it, and he would always remember it; but he testified he recovered from that shock and it had no effect on him during the two years preceding the collision on July 15, 1961.

The testimony of the plaintiff has been set out in considerable detail because it also summarizes the history related by him to his psychiatrist and forms the basis for the opinion of the psychiatrist that plaintiff is suffering from a "conversion reaction" and "compensation neurosis" which were "triggered" by the collision of July 15, 1961.

The psychiatrist spent one hour with the plaintiff. His testimony will be summarized. The plaintiff is a "passive dependent personality" and "has two significant neurotic patterns, one of depression and the other conversion reaction." His neurosis "had its beginning on the farm" in "a hard, dreary existence," and the depressive part of the neurosis "was caused by this accident in 1959" when he could have been killed and "realized at the time of the accident that he was facing death." The witness testified that the 1959 accident left the plaintiff with a feeling of guilt and that the "horrible accident" would be with him "until the day he dies." It was the professional opinion of the witness that the plaintiff's condition was such that he was disabled from driving a truck; and it was his positive opinion that the accident of July 15, 1961 "triggered off" the conversion reaction and that the conversion reaction neurosis was the disabling factor.

The psychiatrist-witness explained the various technical terms and neuroses referred to in his testimony and the effect of the neuroses on the behavior of a person, and particularly on the behavior of the plaintiff.

A "passive dependent personality" is "characterized by helplessness, indecisiveness, and a tendency to cling to others * * * These individuals must, at all

costs, conceal their energy and aggressive impulses from their own consciousness. * * * These are nice, quiet, gentle people, who would never hurt a fly. For such a person hurting a fly, without intending, and without any way of not inflicting the damage or hurting, is a frightening experience." It was his opinion that a person with a "passive dependent personality would be more susceptible to developing a conversion reaction."

The "depressive reaction" neurosis of the plaintiff was related to the accident in 1959. "The effect was that it left him with the realization that he could hurt people"; and "the danger for a person of this personality type is [from fear of] hurting someone else, and not [from fear of] being hurt himself." The "conversion reaction" neurosis was "triggered off" by the accident of July 15, 1961, the essential quality of which "was the complete absence of awareness that it was happening, and, therefore, the inability to make any attempt to prevent it from happening." It was "the experience of the danger of this massive vehicle which could kill, and which could cause damage, without knowing about it * * * that * * * triggered the conversion reaction in the man." The spells of nervousness, dizziness and blackout spells were symptomatic of the conversion reaction neurosis; the dizziness and fainting "in this man serve to prevent overwhelming anxiety."

A "compensation neurosis," according to the witness, is "a condition in which the individual seeks relief from inner conflict through some form of external compensation. * * * This is not to be confused with malingering in which the individual deliberately contrives to imitate an illness for the purpose of gaining compensation." The plaintiff "is seeking relief through court action, and he truly believes that in some way or other this will help him, that he will feel better; and also, as has been observed many, many times, individuals suffering from this condition do feel better after a settlement is reached."

The witness distinguished a "traumatic neurosis" and a "conversion reaction neurosis." A traumatic neurosis "is a description .of a neurosis which occurs in direct reaction to an emotionally traumatic experience, and it is· characterized by the sudden incapacitation of a person." In a conversion reaction neurosis "the pattern of disability develops over a period of time." Asked, "Would that in any manner mean that this type of condition that this man suffers from is any less severe or less disabling than the traumatic or instant neurosis would have been?" the witness answered: "On the contrary, this type of pattern is more likely to be of a more permanent nature than traumatic neurosis."

From the evidence here set out, it is apparent that the jury could reasonably have concluded that the plaintiff had suffered a serious and disabling nervous disorder as a direct result of the collision which was caused by the defendant's negligent acts and omissions, and thus that the evidence supports the jury's finding of causal relation between the defendant's negligence and the plaintiff's injuries. The finding of the cause in fact element of proximate cause is supported by the evidence. But under the law of this State there is a second essential element of proximate cause, i.e., the foreseeability element. Baumler v. Hazelwood, 162 Tex. 361, 347 S.W.2d 560 (1961). The serious question is whether we should hold as a matter of law that the defendant could not reasonably have foreseen that the injuries to the plaintiff's nervous system would be a natural and probable consequence of her negligent conduct. We do so hold.

The court of civil appeals declined to make the holding, relying entirely on this court's decisions in Hill v. Kimball, 76 Tex. 210, 13 S.W. 59, 7 L.R.A. 618 (1890); Gulf, C. & S. F. Ry. Co. v. Hayter, 93 Tex. 239, 54 S.W. 944, 47 L.R.A. 325 (1900); Houston Elec. Co. v. Dorsett, 145 Tex. 95, 194 S.W.2d 546 (1946), and Bailey v. American Gen. Ins. Co., 154 Tex. 430, 279 S.W.

2d 315 (1955). The facts in those cases are so dissimilar from the facts here that they do not rule the question in the instant case. In the first three of the cited cases we held *only* that damages are recoverable for injuries resulting from emotional shock caused by the negligence of another *if the injuries are a foreseeable consequence of the negligent conduct.*[1] *Bailey* was a workmen's compensation case and proof of proximate cause was not essential to a recovery.

*Hill v. Kimball, supra,* was one of the earliest decisions to recognize a right of recovery for injuries resulting alone from fright or other emotional shock. It has been termed by one writer "A Milepost in the Law." See Hallen, 12 Texas L.Rev. 1 (1933). In that case the defendant made a violent assault on two Negroes in the presence of the plaintiff, a pregnant woman. She was so frightened by the incident that she had a miscarriage. The court held that the plaintiff's petition stated a cause of action, but added: "Of course, since there is no intent to injure Mrs. Hill alleged, it will be a question for the jury to determine whether his [the defendant's] conduct, so far as she was concerned, was negligent or not; that is to say, whether, under the circumstances, and with the lights before him, a reasonable man would have anticipated the danger to her or not." 13 S.W. 59. In *Hayter,* the plaintiff suffered a serious nervous affection, known as "traumatic neurasthenia," from a collision, and from witnessing the imminence of the collision, between two trains, on one of which he was a passenger. The trial court's charge to the jury permitted recovery for physical injuries proximately resulting from "mental shock." This court affirmed, and said (54 S.W. 945):

"We conclude that, where a physical injury results from a fright or other mental shock, caused by the wrongful act or omission of another, the injured party is entitled to recover his damages, provided the act or omission is the prox-

imate cause of the injury, *and the injury ought, in the light of all the circumstances, to have been foreseen as a natural and probable consequence thereof. In our opinion, as a general rule, these questions should be left to the determination of the jury."*

The nervous disorders suffered by the plaintiff in *Dorsett* resulted from being narrowly missed by a bus as she was walking across a street with her mother. This court observed in its opinion that it had been stated as a fact in oral argument that the mother was fatally injured by the bus but that this was not shown in the record. We held that the plaintiff's petition stated a cause of action in the face of an objection that the injury was "too remote and speculative, and not the proximate result of the wrongful act." In so holding, we reaffirmed the rule announced in *Hayter,* quoted above, that *as a general rule* questions of causal relation and foreseeability in such cases should be left to the determination of the jury.

It is generally recognized by writers in the field of tort law, as well as by courts of all jurisdictions, that the right of recovery for injuries from mental shock caused by negligent conduct cannot be an unlimited right; that an unlimited right of recovery would impose undue burdens on persons guilty of nothing more than simple negligence. Accordingly, some courts have imposed arbitrary limitations on the right. The limitations are generally keyed to foreseeability of consequences, whether foreseeability is treated as an element of negligence or an element of proximate cause. Two of the limitations will be noticed.

Courts have been virtually unanimous in recognizing that one who suffers injury from mental shock as a result of an injury or threatened injury to a third person cannot recover damages from the negligent tortfeasor. In Nuckles v. Tennessee Elec. Power Co., 155 Tenn. 611, 299 S.W. 775

---

1. Emphasis ours throughout unless otherwise indicated.

(1927), the Supreme Court of Tennessee said: "We are not aware of any considered decision which holds that there can be a recovery for fright or shock because of danger to another or injuries upon another in the presence of the plaintiff, even though the person imperiled or injured was near and dear to the plaintiff." In that case the mother-plaintiff saw her child run over by a street car, but she was not endangered by the car. In Carey v. Pure Distrib. Corp., 133 Tex. 31, 124 S.W.2d 847 (1939), an unsecurely fastened oil drum fell from a truck and the lid blasted off and hit a man lying on a cot by his house trailer near the highway. His wife, who was inside the house trailer, heard the noise and heard her husband say that his head had been caved in. She ran and opened the door and saw that her husband was all bloody. Thereafter, she had a miscarriage. We held that the injury to the husband was reasonably foreseeable by the negligent defendant but that the injury to the wife was not. Prosser states that the reason usually assigned for denying recovery for emotional shock because of fear of injury to a third person "is that the defendant could not reasonably anticipate any harm to the plaintiff, and therefore owes her no duty of care." See Prosser, The Law of Torts, 352 (3d ed. 1964). He recognizes that there is no logical reason for permitting recovery by a woman for shock because of fear of injury to herself and denying her recovery for shock because of fear of injury to her child, but states (pp. 353–54):

"It would be an entirely unreasonable burden on all human activity if the defendant who has endangered one man were to be compelled to pay for the lacerated feelings of every other person disturbed by reason of it, including every bystander shocked at an accident, and every distant relative of the person injured, as well as his friends. And obviously the danger of fictitious claims,

and the necessity of some guarantee of genuineness, are even greater here than before. It is no doubt such considerations that have made the law extremely cautious."

For a contra view, see Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv.L.Rev. 1033, at 1037; and for an analysis of the opposing views, see Hallen, Damages for Physical Injuries Resulting from Fright or Shock, 19 Va. L.Rev. 253, at 267–72, and Smith, Relation of Emotions to Injury and Disease, 30 Va. L.Rev. 193, at 235–43. In an article entitled Liability in New York for the Physical Consequences of Emotional Disturbance, 32 Col.L.Rev. 409, at 417–18, Bohlen and Polikoff suggest:

"It may be that a distinction might properly be drawn between those effects of fright or shock which the common experience of the ordinary man recognizes as likely to result therefrom, such as a miscarriage after a severe fright, and those obscure nervous disorders as to which even medical experts may and do disagree."

Recovery is also generally denied when the plaintiff is unusually or peculiarly susceptible to emotional trauma and that fact is unknown to the negligent tortfeasor. In Haas v. Metz, 78 Ill.App. 46 (1898), the plaintiff sought damages from the defendant because loud and angry talk by the defendant caused the plaintiff to have recurring spells of hysteria. Plaintiff's doctor testified that she had spells of hysteria before the incident. The court concluded its opinion denying recovery with this language: "We conclude * * * that defendant could not reasonably anticipate that the words she spoke and the tone of voice she used would cause the recurrence of an hysterical malady of whose very existence she was not aware * * *." Somewhat analogous are the cases which

hold that one's acts are not negligent toward a person with physical defects if the defects are unknown to the actor and his conduct would not have been negligent toward a normal person. See International & G. N. Ry. Co. v. Garcia, 75 Tex. 583, 13 S.W. 223 (1890); 65 C.J.S. Negligence § 12c, p. 590. In an article by Hubert Winston Smith, Relation of Emotions to Injury and Disease, 30 Va.L.Rev. 193 at 256, the author suggests that the same rule should be applied to deny liability for injuries resulting from emotional shock to idiosyncratic persons. Smith states: "As most persons possess average hardihood and resistance, an actor is entitled to expect that a particular person within his sphere of action has normal fortitude unless he has notice to the contrary." Prosser agrees. In commenting on abandonment in other jurisdictions of the requirement of physical impact, Prosser in his Law of Torts, 352 (3d ed. 1964), states:

"There must necessarily be, in its place, some requirement of satisfactory proof, and at least in the absence of knowledge of the plaintiff's unusual susceptibility, there should be no recovery for hypersensitive mental disturbance where a normal individual would not be affected under the circumstances."

An opposing view is illustrated by two Wisconsin cases. In Sundquist v. Madison Rys. Co., 197 Wis. 83, 221 N.W. 392 (1928), the plaintiff was allowed to recover for hysterical paralysis caused by fright and shock even though all of the medical witnesses agreed that the fright would not have caused paralysis in a normally healthy person. And in Colla v. Mandella, 1 Wis.2d 594, 85 N.W.2d 345, 64 A.L.R.2d 95 (1957), a negligent defendant was held liable for the death of a man from a heart attack brought about by emotional shock even though the proof showed that unknown to the defendant the man had high blood pressure and a heart condition for which he was being treated by a doctor before the traumatic experience.

We need not approve either of the limitations discussed as an arbitrary limitation on the right of recovery for injuries resulting from emotional shock caused by negligent conduct. Both limitations are present in this case. There are also other factors which when combined with the limitations discussed impel a conclusion as a matter of law that the defendant could not reasonably have foreseen the injuries suffered by the plaintiff as a natural and probable consequence of her negligent conduct.

According to the testimony of his own expert witness, plaintiff's conversion reaction neurosis is his disabling condition. This developed from a fear, triggered by the collision, that the negligent defendant might have been injured under circumstances in which the plaintiff could not have prevented the injury. In other words, the emotional shock sustained by the plaintiff was not from fear that he might have been injured but from fear that another might have been injured, the other not being an innocent person subjected to injury by a wrongdoer but the wrongdoer herself. The plaintiff was unusually or peculiarly susceptible to a conversion reaction neurosis. We pass over the testimony of the psychiatrist that "a passive dependent personality would be more susceptible to developing a conversion reaction," but note that the sum total of the witness' testimony shows conclusively that the depressive reaction neurosis suffered by the plaintiff as a result of his accident experience in May, 1959 made him peculiarly susceptible to the conversion reaction neurosis suffered by him as a result of the trifling collision of July 15, 1961. Moreover, the disabling neurosis did not result from an immediate impact of the negligent conduct and collision on his senses, but from learning of it after it happened and after learning that apparently no one was injured in the collision.

Finally, the disabling neurosis, although originating "right after" the collision, was a slowly developing type which did not incapacitate the plaintiff until after the lapse of several months.

We recognize that this field of law is in a developing process, as is the field of psychiatry, and we would be reluctant to hold at this time that any one of the enumerated factors would of and by itself be sufficient to require a judgment denying liability. We are satisfied, however, that public policy is better served by denying liability when all are combined. In dealing with cases of this type on a case by case basis, we will be following a precedent set by the Supreme Court of North Carolina in *Williamson v. Bennett*, 251 N.C. 498, 112 S.E.2d 48 (1960), in which the facts bear a close similarity to the facts in this case.

Some stress is laid by the parties on the testimony of the psychiatrist that the plaintiff had a compensation neurosis. We have not discussed the problem because of the testimony of the psychiatrist that the conversion reaction neurosis was the disabling neurosis. We are aware of our decision in *Hood v. Texas Indem. Ins. Co.*, 146 Tex. 522, 209 S.W.2d 345 (1948), in which we upheld a recovery of workmen's compensation benefits during a period of disability caused by compensation neurosis; but we note in passing, without approval or disapproval, that in a casenote in 37 Texas L.Rev. 361, a doctor-writer predicts that a policy of not allowing recovery for compensation neurosis "will probably prevail in tort cases, since the courts are not likely to hold that the negligent actor should, at the time his negligence occurs, foresee the development of a compensation neurosis."

The judgments of the courts below are reversed and judgment is here rendered that the plaintiff take nothing.