Susan **QUINIUS**, Appellant,

v.

**Manuel M. ESTRADA, Jr., et al.,** Appellees.

No. 11705.

Court of Civil Appeals of Texas.

Austin.

Oct. 22, 1969.

Rehearing Denied Nov. 19, 1969.

Thompson, Coe, Cousins, Irons & Porter, R. R. Cousins, Dallas, for appellant.

Rogan B. Giles, Clark, Thomas, Harris, Denius & Winters, John Coates, Robert C. McCreary, Mary Joe Carroll, Barry Bishop, Austin, for appellees.

HUGHES, Justice.

This suit arises out of the same incident involved in Polasek v. Quinius, 438 S.W.2d 828, Tex.Civ.App., Austin, writ ref. n. r. e. (1969). In that case Mary Sue Polasek recovered damages for injuries sustained from Susan Quinius as a proximate result of her negligence. There were three cars involved in the incident, which occurred June 21, 1966, in Austin, Texas, one operated by appellant which she drove south into Northland Drive, an east-west four lane main traffic artery, across the two westbound lanes of Northland and into its near eastbound lane striking the left side of the Polasek car causing it to swerve across the center line of Northland and collide headon with the car operated by Manuel M. Estrada, Jr., appellee, who was driving west on Northland.

In this suit, appellee sued both Susan Quinius and Mary Sue Polasek seeking property damages and damages for personal injuries allegedly resulting from their negligence. Trial to a jury resulted in findings that Susan Quinius was guilty of negligence which was a proximate cause of the collisions, and that Mary Sue Polasek was not guilty of any negligent act. Judgment against Susan Quinius only for the damages sustained by Appellee Estrada was rendered in accordance with the jury findings.

In her pleadings, appellant alleged that Mary Sue Polasek, driver of the first car struck, failed to wear a seat belt available to her and that, as a result of such failure, she lost control of her car with the result that the collision with the Estrada car occurred and that this failure was negligence and a proximate cause of the second collision and resultant injuries and damages. Appellees specially excepted to this pleading on the ground that "* * * Mary Sue Polasek had no duty as a matter of law to have a seat belt fastened or unfastened * * *"

These exceptions were sustained by the trial court he being of the opinion that Mary Sue Polasek had no duty, as a matter of law, to have a seat belt fastened. We agree with the trial court.[1]

A great deal has been written on this subject and we will not undertake an analysis of all the arguments made for and against the imposition of a duty to wear seat belts. It must be remembered that we are concerned only with the wearing of the seat belt as negligence, not with the obligation to wear seat belts in order to mitigate the extent of injuries. This latter question is not before us.

In Sonnier v. Ramsey, 424 S.W.2d 684, Tex.Civ.App., Houston (1st Dist.) writ ref. n. r. e. (1968) the jury found that the failure of plaintiff to wear seat belts was negligence which was a proximate cause of his injuries and that 5% of his injuries was due to this failure. Judgment was rendered for defendant and was reversed and remanded on appeal. Regarding the seat belt findings, the Court stated:

"If there is a duty to use a seat belt (which decision is reserved for a future case), we believe the seat belt question should be considered in connection with damages rather than liability. We agree with a suggestion made by Messrs.

1. This conclusion is reached without consideration of Sec. 140(a), Art. 6701d, Vernon's Ann.Tex.Civ.St. which was amended to include seat belts as an inspection factor subsequent to June 21, 1966.

Jerry Walker and David Beck, members of the Houston Bar, in an article entitled 'Seat Belts and The Second Accident' in the Insurance Counsel Journal for July, 1967, at page 355, that the matter be regarded in mitigation of damages rather than contributory negligence.

The failure to use a seat belt may contribute to the cause of the injury, but almost never to the cause of the accident. This sounds in damages, not liability.

The analogy to the duty to minimize the consequences is not complete, because such duty arises after the accident, but we think the problem more closely related to damages than to liability."

The validity of the Court's pronouncements regarding the seat belt findings was squarely presented to the Supreme Court in defendant's petition for writ of error by several assignments. We consider the action of the Supreme Court as approving the comments of the Court of Civil Appeals insofar as they indicate that wearing a seat belt had no relevance to the issue of liability.

There was no evidence in Sonnier that the failure to wear a seat belt in any way contributed to the collision there involved. In fact, we have not been cited to any case which has held that failure to wear a seat belt caused an accident or collision. There are many statistics involving motor vehicle accidents and some are cited to us but none is cited and apparently none exists showing the number of accidents, if any, caused by the failure to wear seat belts.

One of the latest cases on the subject is Romankewiz v. Black, 16 Mich.App. 119, 167 N.W.2d 606, Court of Appeals, Michigan (1969). This case discusses about fifteen cases which have considered the seat belt defense. We refer to that opinion wherein it is held that there was no duty on the part of the plaintiff to wear a seat belt, the Court saying, "Unbuckled [seat belts] do not *cause* accidents."

Appellant cites Bentzler v. Braun, 34 Wis.2d 362, 149 N.W.2d 626 (1967) as the leading case establishing the common law duty to wear available seat belts. The Court there said, "The question, therefore, is not whether the guest's (a passenger) negligence (failure to wear an available seat belt) contributed to the cause of the accident but, rather, whether it contributed to the injuries." Further discounting the authority of Bentzler in this case is the fact that Wisconsin recognizes the comparative negligence doctrine.

It is our opinion that Mary Sue Polasek was under no duty to Mr. Estrada to wear her seat belt and hence was not negligent as to him under the rule stated in Rudes v. Gottschalk, 159 Tex. 552, 324 S.W.2d 201 (1959) which we quote:

"We may perhaps safely say that legal liability will not attach to an act or omission unless the alleged wrongdoer could have reasonably anticipated probable harm from his conduct. Foreseeability is undoubtedly a test of negligence, for certainly a prudent man would not do that which he could foresee would result in harm."

■ "An injury is not actionable if it was not foreseen, or could not have been foreseen or reasonably anticipated, as a consequence of the act or omission." 40 Tex.Jur.2d, p. 455. See Genell, Inc. v. Flynn, 163 Tex. 632, 358 S.W.2d 543 (1962).

We hold, as a matter of law, that the alleged failure of Mary Sue Polasek to fasten her seat belt was not actionable negligence in that she owed no duty to appellant or Mr. Estrada to do so, the reason for this being, in our opinion, that she could not reasonably anticipate or foresee that her failure to fasten such belt would result in her failing to regain control of her car after it went out of control after being struck by a car negligently operated by Susan Quinius. In the first place, Mary Sue Polasek was under no duty to anticipate the negligent conduct of Susan Quinius in driving into her car. In

the second place, the wearing of a seat belt has relevance only to the safety or protection of the person wearing it as is shown by the authorities generally and which we take notice of as a matter of general knowledge. The fact that it is alleged that failure to wear a seat belt accounted for the failure of Mary Sue Polasek to regain control of her car before colliding with the Estrada car three seconds later does not alter our opinion that such failure was not negligence because no reasonably prudent person could anticipate or foresee such result or one similar thereto.

The above discussion relates to appellant's first point which we overrule.

Appellant's second point is that the trial court erred in sustaining special exceptions to her pleading that failure of Mary Sue Polasek to wear her seat belt constituted an intervening cause of the collision with the Estrada car and his injuries.

From an examination of appellant's pleading, we fail to find any allegation that the failure of Mary Sue Polasek to wear her seat belt was a new and intervening cause of the collision with the Estrada car and his injuries. A Court could not err in sustaining exceptions to allegations not made. It seems, however, that the defense of a new and intervening cause need not be pleaded since it is not an affirmative defense. Dallas Railway & Terminal Co. v. Bailey, 151 Tex. 359, 250 S.W.2d 379 (1952), Defensive Issues on New and Independent Cause, etc., 6 Baylor Law Review by Olan B. Lowrey, 6 Baylor L. Review 457 (1954).

Appellant did not offer any evidence to support this theory of new and independent cause and made no objections to the charge of the Court in this respect.

For all of the reasons stated, we overrule appellant's second point.

Points three, five and six are jointly briefed. These points are that the trial court erred to hold that the psychiatric injury of Mr. Estrada was not foreseeable to appellant under the prevailing circumstances and that any negligence on her part was not a proximate cause of his injury because of his admitted predisposition to such an injury; also, that the adverse findings of proximate cause of the Polasek-Estrada collision and resultant injuries to Estrada were against the greater weight and preponderance of the evidence.

Appellee Estrada pleaded that, "As a direct and proximate result of the above described collision, Plaintiff has suffered a severe psychoneurotic conversion reaction."

Two psychiatrists testified on behalf of Mr. Estrada at the trial, Dr. David Wade and Dr. Stuart S. Nemir, Jr. Appellant cites the following testimony of Dr. Wade, in support of these points:

"Q What percentage of the people that you treat in your profession as a psychiatrist do you say come there as a result of a traumatic origin?

A Probably not more than one percent.

Q All right, sir. In other words, no more than one percent of your patients come to you as a result of a psychiatric disorder which has its origin in some type or character of accident?

A This is true.

\* \* \* \* \* \*

Q All right sir. You know as a matter of practice, as a matter of a man educated in your field, that the tremendous majority of people who have accidents of this kind do not in fact develop a psychoneurotic disorder?

A I don't know anything about the statistics.

Q Well, I am not asking for specific statistics or percentages, Doctor.

I am merely saying that you know as a practical matter, being a psychiatrist with the training that you have had and living in Texas as long as you have, that the great majority of people who have accidents do not develop psychoneurotic disorders?

A Can we say 'many people?'

Q Would you admit that the great majority don't?

A Could we leave off 'great?' I don't know the percentages.

Q I am not asking for percentages, Doctor. I am merely saying this; that in order for a person to have this kind of a reaction, there is almost certainly to have some kind of a predisposition to that kind of reaction.

A I think that anybody who develops any psychiatric disorder has some kind of predisposition to this disorder in some degree or another.

Q Yes, sir. So that predisposition is something which nobody knows that the person you are meeting on the street coming in the opposite direction does or does not have.

A That is right, if so, you would choose not to run into them."

Similarly, appellant cites the following testimony of Dr. Nemir:

"Q We know, of course, Doctor, as a practical matter, that many people have accidents in which injury, actual physical injury, is sustained which is equivalent or worse than those sustained by Mr. Estrada, who do not develop psychoneurotic problems, is that true?

A Yes, sir.

Q Let me be sure that we understand each other again. You would class this as a psychoneurotic rather than as a psychotic problem, correct?

A Yes, sir.

Q Doctor, how many patients come to you with need of psychiatric help where you can trace the cause back to an injury?

A How does one estimate percentages? Possibly a very, very small percentage.

Q That's fine. In other words, it would be a very small minority of cases which you have had in your experience or patients who need your help you can trace their problem back to an injury of any kind, is that a correct statement?

A That's probably correct.

Q What is the cause, what is the reason that the great majority of people who have accidents who sustain injuries of the severity related by Mr. Estrada, or worse, that they recover and don't have any psychoneurotic disorders, why is that?

A Due to individual variations and a number of factors are included. A person's mental makeup, when this thing occurs certainly has something to do with it. The direct trauma at the time together with whatever his coping mechanisms are, these things are important.

Q And all of those are developed prior to and in advance of the accident which occurs?

A In all of us our coping mechanisms are developed.

Q Which necessarily, then, would yield or lead to the conclusion that those people who develop psychotic problems, or psychoneurotic problems, as the result of an accident have some built-in predisposition to a result which follows the accident?

A I can't agree with that entirely. I could not predict that five people

with the same set of coping mech-·
anisms would react necessarily in
the same way.

Q  I appreciate that.  But the fellow
who cracks, the fellow who breaks,
psychiatrically, has got to have
something built into him before that
accident which is going to have at
least an impact or play a part in the
psychiatric results following the ac-
cident?

A  I think that's probably true."

Other facts relevant to these points are:

At the time of the collisions on June 21,
1966, Northland Drive in Austin, Texas,
was a major thoroughfare and Louise Street
was a residential street.  Northland was 40
feet wide, running in a general east-west di-
rection and carried four lanes of traffic,
two west and two east, divided by a double
stripe in the middle.  Louise was 36 feet
wide, running generally north and south,
and terminating at its intersection on the
north side of Northland, forming a "T" in-
tersection.  The collisions took place at
about 7:45 a.m. on a Tuesday morning when
the pavement was dry.  Appellant Quinius
was aware that not only was Northland
Drive a heavily traveled street generally,
but also that it was busy with traffic im-
mediately before the collisions made the
basis of this suit.

Just before the collisions occurred, Appel-
lee Estrada was driving his Mercury station
wagon in a westerly direction on Northland,
approaching Louise Street from the east,
Mary Sue Polasek was driving a Dodge au-
tomobile in an easterly direction on North-
land, approaching Louise from the west,
and Appellant Quinius, driving her father's
Oldsmobile automobile was stopped on
Louise Street, facing south at the inter-
section of Northland and Louise, waiting
for traffic to clear before entering North-
land.  Without seeing the Polasek Dodge
approaching from her right, Susan Quinius
started her Oldsmobile into Northland
Drive, ignoring two separate warnings

from her passenger, Judy Lester (Kirtley)
about the approaching car.  The right front
corner of the Quinius car struck the left
side of the Polasek Dodge as it was pass-
ing in the south half of Northland Drive.
Only one or two seconds passed from the
time the Quinius Oldsmobile started into
Northland Drive from Louise until it hit
the side of the Polasek Dodge.

Immediately after the first collision, the
Polasek Dodge veered first to the right
and then to its left across the center line of
Northland Drive into the lanes of traffic
for westbound traffic and collided head-
on with the Estrada station wagon in Estra-
da's side of the road.  The second collision
between the Polasek Dodge and the Estra-
da Mercury station wagon occurred about
150 feet east of the intersection of Louise
and Northland.  The Estrada vehicle left
22 feet of swerving skidmarks to its right
before the second collision.  The second
collision was characterized by appellant's
witness Tonn as "a real severe collision."
Tonn is an accident reconstruction expert.

Between the first collision and the second
collision, the Polasek Dodge was de-
scribed by witnesses as "out of control."
Appellant's witness Tonn also testified that
the speed of the Polasek Dodge was thirty-
five miles per hour at the time of collision
with the Estrada vehicle and that the Es-
trada vehicle was going twenty-five miles
per hour at the same time.  He further
testified that this was a closing speed of
sixty miles per hour, and that to produce
the same damage to the Estrada vehicle in
a one car collision, the Estrada vehicle
would have had to run into a concrete wall
at forty-three miles per hour and stopped
in place.

Appellant's witness Tonn further testi-
fied that at 30 miles per hour, it would have
taken the Polasek Dodge only 3.4 seconds
to travel the 150 feet from the first col-
lision to the second collision.  At 35 miles
per hour, the time would have been less
than 3.4 seconds, and Tonn's own estimate

of the speed of the Polasek Dodge was 35 miles per hour.

It is without dispute that as a result of the second collision, Estrada received physical personal injuries consisting of a laceration of the left forehead, laceration of the left forearm and abrasions and bruises of the right knee, and subsequently developed a contracture of the left eyelid from a scar caused by the laceration of his forehead and eyebrow.

As a result of the second collision and the physical injuries sustained by him, Appellee Estrada suffered psychoneurotic reaction or conversion reaction which has disabled him from doing his work as a painter.

Appellant relies principally upon Kaufman v. Miller, 414 S.W.2d 164, Tex.Sup. (1967). In that case the plaintiff was driving a truck with a trailer when, unknown to plaintiff, a car collided with the trailer causing no damage to the truck and insubstantial damage to the car, and plaintiff was not physically injured. When plaintiff later realized there had been an accident he stopped, went back to the car and found three women, one of whom told him that he had hit the car and this "got me all shook up, then, and shocked," and plaintiff suffered a serious and disabling nervous disorder. The Supreme Court held, under these circumstances, that the driver of the car, defendant, could not have reasonably foreseen that the injuries to plaintiff's nervous system would be a natural and probable consequence of her negligent act which caused the slight collision. The plaintiff there was unusually or peculiarly susceptible to a conversion reaction neurosis resulting from prior accidents.

The Court in Kaufman was very careful to limit its decision to the facts of the case, saying:

"We recognize that this field of law is in a developing process, as is the field of psychiatry, and we would be reluctant to hold at this time that any one of the enumerated factors would of and by itself be sufficient to require a judgment denying liability. We are satisfied, however, that public policy is better served by denying liability when all are combined."

Some of the "factors" not present in Kaufman and present here are, (1) substantial physical injuries to Plaintiff Estrada, (2) an impact of great force set in motion and proximately caused by appellant which resulted in Estrada's physical injuries.

The Court in Kaufman states, "Recovery is also generally denied when the plaintiff is unusually or peculiarly susceptible to emotional trauma and that fact is unknown to the negligent tortfeasor," citing Haas v. Metz, 78 Ill.App. 46 (1898). This all inclusive statement, in our opinion, is far too broad. The facts in that case were that loud and angry talk by the defendant caused plaintiff to have recurring spells of hysteria. There was no physical impact and no physical injury sustained by plaintiff. Such conduct by defendant was simply not calculated to produce harm or injury to any one. The Court's broad statement, taken out of context, is not harmonious with other portions of the opinion as is shown by the following quotation from Kaufman which immediately follows its discussion of Haas:

"Somewhat analogous are the cases which hold that one's acts are not negligent toward a person with physical defects if the defects are unknown to the actor and his conduct would not have been negligent toward a normal person. See International & G. N. Ry. Co. v. Garcia, 75 Tex. 583, 13 S.W. 223 (1890); 65 C.J.S. Negligence § 12c, p. 590. In an article by Hubert Winston Smith, Relation of Emotions to Injury and Disease, 30 Va.L.Rev. 193 at 256, the author suggests that the same rule should be applied to deny liability for injuries resulting from emotional shock to idiosyncratic persons. Smith states: 'As most persons

possess average hardihood and resistance, an actor is entitled to expect that a particular person within his sphere of action has normal fortitude unless he has notice to the contrary.' Prosser agrees. In commenting on abandonment in other jurisdictions of the requirement of physical impact. Prosser in his Law of Torts, 352 (3d ed. 1964), states:

'There must necessarily be, in its place, some requirement of satisfactory proof, and at least in the absence of knowledge of the plaintiff's unusual susceptibility, there should be no recovery for hypersensitive mental disturbance where a normal individual would not be affected under the circumstances.' "

The real gist of Haas and the authorities quoted is that conduct not negligent towards a normal person will not be held negligent as to an abnormal person in the absence of scienter of the abnormality. Neither Haas nor the other authorities cited in Kaufman preclude recovery for the psychoneurotic reaction or conversion reaction suffered by Mr. Estrada, following serious physical injury, as a proximate result of the negligent acts of appellant which negligent acts would constitute actionable negligence in favor of all persons including the lame, the halt or the blind.

See Thompson v. Quarles, 297 S.W.2d 321, Tex.Civ.App., Galveston writ ref. n. r. e. 1956; 17 Tex.Jur.2d, p. 188; 38 Am.Jur. 2d, Fright, Shock, etc., Sec. 27, p. 32. The purport of these authorities is that an active tort-feasor must take his victims as he finds them.

It is common knowledge with which all are charged that our streets and highways are used by persons of all ages and of as many individual characteristics of mind and body as it is possible to conceive. The rule advocated by appellant would free negligent operators of motor vehicles from liability for damages for the major suffering sustained by an idiosyncratic plaintiff. This is not and should not be the law.

We overrule the points under consideration.

Appellant's remaining points, four and seven, are that any negligence on her part could not, as a matter of law, be the proximate cause of the collision between the Polasek and Estrada cars, and that there was no evidence to sustain the findings of proximate cause as to the injuries sustained by Mr. Estrada in the second collision. We overrule these points.

The substance of appellant's argument under these points is found in this language in her brief: "The facts are, as previously stated, that Appellant was involved in a very minor collision with another automobile. That other automobile without slackening speed, with the driver obviously having completely lost control of it, traveled in a very erratic manner, the brake not being applied, struck another automobile 150 feet distant traveling in an opposite direction.

This is one of those freak accidents which, to our mind, is not something which the ordinary prudent person would expect to have happen. Thus, whatever negligence Miss Quinius was guilty of at the intersection of Louise and Northland Drive, that causation just cannot be stretched to the point of the second collision."

We disagree with this argument. However slight the impact between the Quinius and Polasek cars may have been it was of sufficient force to cause the Polasek car to go out of control and to swerve from one side of the road to the other. That such erratic movements on a four-lane main traffic artery would likely result in a collision is, in our opinion, foreseeable to the average person. It is said that some sports are games of "inches." Highway safety is, at most, a matter of very few feet.

**560**

It requires but little force to squeeze the trigger of a gun, but the force released is tremendous. So it is when a slight jar converts an automobile traveling leisurely at a modest speed into a ponderous, hurtling mass spewing death and destruction.

Finding no error, the judgment of the trial court is affirmed.

We quote from appellant's motion:

"Apparently believing that it is necessary for you to have some authority, you have in your opinion relied upon Sonnier v. Ramsey, 424 S.W.2d 684, ref. n. r. e. And you have stated that you have gone outside the record, examined the application for writ of error which was not filed in your Court, and based upon your examination of the application you say:

'We consider the action of the Supreme Court as approving the comments of the Court of Civil Appeals insofar as they indicate that wearing a seat belt had no relevance in the issue of liability.'"

While our opinion does reflect that we examined the writ of error application in Sonnier, supra, we did not say that we had "gone outside the record." Rule 371, Texas Rules of Civil Procedure provides that the record on appeal consists of a transcript and, where necessary, a statement of facts. We rarely find the law in the record. We look for it in the briefs. We also, on occasion, conduct independent research, the range and scope of which is unbounded, unrestricted, undefined, and not subject to circumscription.

Appellant completely misapprehends our decision on the seat belt question. We did not say that the failure of Mary Sue Polasek to buckle her seat belt did not cause the collision with the Estrada car. We did say that such failure was not negligence.

The motion is overruled.