Corwin Calvin **PADGET** and **North Plains Electrical Co-op, Appellants,**

v.

**Connie GRAY, et vir., Appellees.**

**No. 07–85–0208–CV.**

Court of Appeals of Texas, Amarillo.

March 18, 1987.

James A. Besselman and Kelly Utsinger, Underwood, Wilson, Berry, Stein & Johnson, Amarillo, for appellants.

John W. Warner, Warner & Finney, Pampa, for appellees.

Before DODSON, COUNTISS and BOYD, JJ.

DODSON, Justice.

Corwin Calvin Padget and North Plains Electrical Co-op appeal from the trial court's judgment rendered in favor of Connie Gray in the amount of $56,000 for personal injuries sustained by her in an automobile-truck accident. By five points of error, the appellants claim the trial court committed reversible error because the testimony of a psychiatrist was inadmissible, the evidence was legally and factually insufficient to support the jury's award for future medical treatment, past pain and suffering, future pain and mental anguish, loss of future earning capacity, and improper jury argument by appellees' counsel. We affirm.

The record shows that on 30 August 1982, Connie Gray was a passenger in a vehicle driven by Brenda Johnson in a northerly direction on Loop 143 approximately seven miles northwest of Perryton, Texas, when that vehicle collided with a pickup truck driven by Padget while in the course and scope of his employment with North Plains Electrical Co-op. As a result of the collision, Connie received a deep laceration to her head which was approximately eleven inches long and eight centimeters deep. Forty to fifty stitches were required to close the wound. She was rendered unconscious and suffered a severe cerebral concussion. Also, Connie's left kneecap was broken and separated by a space of three or four millimeters. She further received multiple bruises and contusions.

Since the appellants admitted liability, the case was submitted to the jury on the damages issue only. In response to special issue number one, the jury determined that $15,000 was the reasonable and necessary sum of money to compensate Connie for her *future* medical care and treatment. In response to special issues numbered 2(a), 2(b), and 2(c), the jury determined that $10,-000 was the fair and reasonable sum of money to compensate for *past* physical pain and mental anguish, $10,000 was the fair and reasonable sum of money to com-

pensate for *future* physical pain and mental anguish, and $21,000 was the fair and reasonable sum of money to compensate Connie for her loss of future earning capacity.

By their first and fourth points of error, the appellants claim the trial court erred by admitting the testimony of Dr. William Kracke, a psychiatrist, because his testimony was directed to damages which were not, as a matter of law, proximately caused by the accident in question, and was neither material nor relevant to any issue, and was so highly prejudicial and inflammatory as to cause the jury to render an excessive verdict. Under these points of error, the appellants claim the psychiatrist's testimony concerning Connie's psychological problems was inadmissible because, as a matter of law, Connie's "psychological disorder is the natural and probable result of her sexual indiscretions occurring several years before the August 30, 1982 accident and could not have resulted from the accident." And "[m]oreover, these psychological problems, springing from events years before the accident, could not have been reasonably foreseen by Defendant [the appellants]." In that regard, the record shows that, as a teenager, Connie was abused in an incestuous relationship with her stepfather and uncle. She married at sixteen to remove herself from those circumstances.

The record shows that Connie had received some medical treatment for her psychological problems which had its genesis in the incestuous relationship. However, Dr. Kracke testified that prior to the accident, Connie had developed internal defensive mechanisms which allowed her to cope with that psychological problem. Her defensive mechanism in regard to those matters was totally destroyed by the post-accident depression which she had as a result of the injuries received in the accident and the long recovery period coupled with her helpless state for several months after the accident.

The appellants rely on Dr. Kracke's testimony at the voir dire hearing to show that Connie's psychological problems, as a matter of law, were not foreseeable by them and were inadmissible. That testimony reads:

Q. Okay. My question is, given a laboratory opinion and you are asked as a psychiatrist, do you have an opinion based upon reasonable medical probability that a traffic accident which results in a scalp laceration and a broken knee cap is more probable than not and consequently foreseeable that it will cause the injured person to have the kind of depression which has its genesis in this incest that you see in Connie Gray? Is that foreseeable generally?

A. It's foreseeable in Connie Gray. It would be unlikely in a sample of the general population.

Q. And not foreseeable because the law of probabilities would say, not probable?

A. If that would be your interpretation.

Q. That's your opinion is it not?

A. That's correct.

They further rely on *Kaufman v. Miller*, 414 S.W.2d 164 (Tex.1967) to support their position that the doctor's testimony was inadmissible since they had no prior knowledge of Connie's psychological infirmities and that those infirmities, as a matter of law, were unforeseeable.

In *Kaufman*, the Court determined that the defendant whose automobile struck the plaintiff's truck without causing any substantial damages to the vehicle or any physical injuries to the plaintiff, as a matter of law, could not have reasonably foreseen that, as a natural and probable consequence of negligence, the plaintiff truck driver would suffer conversion reaction neurosis. The plaintiff was peculiarly susceptible to this neurosis as a result of an earlier accident, but the neurosis was actually triggered after the plaintiff learned of the present accident, after which the neurosis developed slowly and did not incapacitate the plaintiff until several months later. 414 S.W.2d at 167. The Court's decision in *Kaufman* was reluctantly made and it expressly limited the particular circumstances of the case. Since the circumstances in *Kaufman* are so dissimilar to the

facts before us, we conclude that *Kaufman* is neither controlling nor persuasive in this instance.

The record before us shows that Connie received severe injuries to her head and left knee. She received medical treatment in an Amarillo hospital. While in the hospital, she was dizzy, disoriented, cried easily, and was unable to get around on her crutches. After she was released from the hospital, Connie recuperated at the house of her mother-in-law. During that time the dizziness, disorientation, and crying continued. Her mother-in-law had to help her bathe and use the bathroom. During this period, Connie was in a great deal of pain. She was self-conscious since her head had been shaved and the scar and stitches were present. She stayed with her mother-in-law for approximately nine weeks.

After the accident, Connie experienced a marked personality change. Before the accident, she was an active, outgoing individual who excelled as both a nurse and a mother. She was a "life-of-the-party" individual. However, after the accident, she became depressed and withdrawn, short-tempered, and wanted to be alone. She transformed into a very solemn person who cried very easily.

Before the accident, she had received treatment from her family physician for occasional mild depression; however, after the accident, her depression evolved into a chronic condition which endangered her health. Her family physician stated that depression is not unusual following an accident, and he further testified that the severity of the depression depends upon the extent of the injuries; the extent of the recovery; the time of recovery; and, to some degree, the individual's emotional stability and ability to cope with convalescing.

The doctors who treated Connie after the accident referred her to Dr. Kracke, a psychiatrist. Dr. Kracke first saw Connie on 21 February 1983. At that time she was suffering from a major depression. The doctor explained that a major depression is life threatening. He found that Connie had an appetite disturbance resulting in a mild loss of weight that was not grave, but significant, a sleep disturbance, low self-esteem, a high degree of sensitivity, irritability, a low frustration tolerance, and expressed concerns about her suicidal thoughts and feelings. The doctor stated the low self-esteem stemmed from rather major episodes of abuse as a child.

Concerning the prior abuse, the major depression and how those matters were affected by the injuries received in the accident, the record shows the following dialogue:

Q. Doctor, you understand that I appreciate what you're saying, but I think this jury has got to know the whole story. It's in fairness to the Defendants in this case and so that if there is any possibility of any error in your diagnosis that it could be established. Now, as her representative I'm asking you if you would to [sic] discuss the situation fully, completely, no holds barred, that is to tell the jury about it. Now, if you—You know, if you need anything further I'll try to get it for you, but I believe that would be enough said, sir.

A. All right. I again would prefer to restrict my answer as to opinion related to events as I understand them, and I'll try to do the best I can and try not to go into too much detail.

Q. All right, sir. Go ahead, please.

A. It's my understanding that in the course of Mrs. Gray's childhood that after the disruption of her biological parents' marriage which had a great deal of violence associated with it that a second marriage occurred between her mother and what became her step-father, and that an [incestuous] relationship occurred that was rather difficult for Mrs. Gray over some period of time, and that her efforts to escape that and live with an aunt, her mother's sister and uncle, that she found herself in the midst of another sexually abusive situation resulting in her finally basically marrying, I think to escape, at age sixteen.

Q. Okay. Now, Doctor, surely you understand that there is no attempt by Connie Gray to blame the Defendant Co-

op for that situation. That happened a long time ago, correct?

A. I don't—I've not ever heard her bearing animosity to anyone except her uncle and her father, step-father, excuse me. She refers to him as her father.

Q. *All right. Now, can you tell us how that situation then fits in to her situation as it exists now; that is, her major depression, and if it was, how it was affected by the injuries she received in a collision which occurred on August the 30th, 1982?*

A. That's a big question. Let me try to take that a little at a time.

Q. Okay.

A. The natural mechanisms which an individual such as Mrs. Gray, and in fact, Mrs. Gray, would utilize in trying to handle the emotional trauma of that kind of experience from childhood would be to, what we refer to, as repress those feelings and repress those memories. That is something akin to blocking them out, burying them, putting them as much as possible out of awareness, and moving forward in her life with as little effort in looking back as possible, but the underlying emotional scars, if you will, persist with a sense of an individual who inwardly feels some guilt; that is, some sense of responsibility for having caused and created the abuse which is relatively typical of an abused individual, a sense of shame, fear of being discovered, and an inward sense of rage that can go nowhere in that the individual feels completely helpless to alter the circumstances that have happened and completely helpless to bring about any resolution because that would require exposure so that the entire process must remain secret, and in that sense tends to remain inside the individual with the individual going on with life trying to bury, push away, not deal with or not handle those feelings in an attempt to compensate in whatever way possible to gain a sense of self-worth which cannot be really had inwardly.

An individual with this kind of unresolved dilemma can't feel inside themselves that, I'm okay, that I'm worthwhile, that I'm valuable, without having to do anything. *Just because I am an individual in this set of circumstances rather has to have a sense of earning their self-worth through a feeling of productivity,* through devoting themselves to various roles, wife, mother, employee, et cetera, and gain what good feelings they can gain from outside rather than from inside.

*I think such was the circumstances pertaining to Mrs. Gray which seemed to work reasonably well for her throughout most of her adult life up until the onset of the accident, injuries, and recovery.*

*I think several things happened attendant to that accident that are responsible for precipitating or aggravating the major depression; that is, the individual found herself in a state of, again, physical helplessness, in considerable pain, in a situation where she was required to be strapped down to an examining table and subsequently in intensive care to keep from pulling out I.V.'s, et cetera, in her confusion from the concussion, having her clothes torn off which precipitated and pulled out of the closet, if you will, all of the memories related to the earlier experience of the attack, and is something like opening Pandora's box, pulling the cork out of the bottle.* Whatever kind of phraseology you might like to use *it reawakened these feelings that had been buried and pushed aside,* and then Mrs. Gray not only had the usual recovery from the accident, but then this sort of flooding of feelings and repressed memories to contend with. *That, in fact, set up or resulted in the major depression.*

Q. So, I understand then that these feelings had been buried by her activity, by being a super mother or a super nurse; that is, by activity she was able to keep those feelings from taking over?

A. That's correct.

Q. *But that then when she was injured that it took away her defensive mechanisms?*

A. *The resultant position of being not in control physically, emotionally, being helpless, being back in a victim status uncorked the previous traumas.* [emphasis added]

On cross-examination by appellant, the doctor testified, "In my opinion the major depression following the accident was directly precipitated, aggravated, [and] triggered by the accident."

Since the decision in *Hill v. Kimball*, 76 Tex. 210, 13 S.W. 59 (1890), Texas has recognized the right to recover for negligently inflicted emotional distress. As the appellants point out in their brief, proximate cause consists of two elements: (1) cause in fact, and (2) foreseeability. *Missouri Pac. Ry. Co. v. American Statesman*, 552 S.W.2d 99, 103 (Tex.1977). "Cause in fact" means that the negligent act or omission of the wrongdoer was a substantial factor in bringing about the injury and without which no harm would have been done. *Id.* at 103. "Foreseeability" is established by proof demonstrating that a person of ordinary intelligence and prudence "should have anticipated the danger to others created by his negligent act and the rule does not require that he anticipate just how injuries will grow out of that dangerous condition." *Clark v. Waggoner*, 452 S.W.2d 437, 439–40 (Tex.1970).

■ Furthermore, in Texas, the tort-feasor takes his victim as he finds him. As the court stated in *Thompson v. Quarles*, 297 S.W.2d 321, 329 (Tex.Civ.App.—Galveston 1956, writ ref'd n.r.e.), when quoting from 15 Am.Jur., *Damages*, Sec. 81, page 490:

> The general rule seems to be that where the result of the accident is to bring into activity a dormant or incipient disease, or one to which the injured person is predisposed, the defendant is liable for the entire damages which ensue, for it cannot be said that the development of the disease as a result of the injury was not the consequence which might naturally or ordinarily follow as a result of the injury, and therefore, the negligent person may be held liable therefor. In other words, *if a latent condition itself does not cause pain, suffering, etc., but that condition plus an injury caused such pain, the injury, and not the latent condition, is the proximate cause.* [emphasis added]

Moreover, we are not persuaded that *Kaufman v. Miller*, 414 S.W.2d 164, precludes recovery by every person who has an emotional problem and who is predisposed to psychological trauma under the foreseeable element of proximate cause. *See Quinius v. Estrada*, 448 S.W.2d 552 (Tex.Civ.App.—Austin 1969, writ ref'd n.r.e.), where the court discussed, explained, and distinguished *Kaufman*.

■ Consequently, we conclude that the doctor's challenged testimony was admissible. The appellants' first and fourth points of error are overruled.

By their second and third points of error, the appellants maintain that the evidence is legally and factually insufficient to support the jury's answers to special issues numbered 2(a), 2(b), and 2(c) (*i.e.,* the jury's award for future medical treatment, past pain and suffering, future pain and suffering, and loss of earning capacity). We disagree.

■ In determining the appellants' legal sufficiency challenges, we must review the evidence in the light most favorable to the jury's answer and disregard any contrary evidence to ascertain if there is any probative evidence and reasonable inferences therefrom to raise the issue and to support the jury's answer. *See Freeman v. Texas Compensation Ins. Co.*, 603 S.W.2d 186, 191 (Tex.1980); *Goodyear Tire & Rubber Co. v. Jefferson Const.*, 565 S.W.2d 916, 918 (Tex.1978); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). However, in determining the appellants' factual sufficiency challenges, we must consider all of the evidence favorable and contrary to the challenged finding to ascertain if the finding is so against the great weight and preponderance of the evidence as to be manifestly wrong or unjust. *Traylor v. Gould*, 497 S.W.2d 944, 945 (Tex.1973); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 662 (1950).

Under these points of error, the appellants' legal and factual insufficiency challenges are primarily predicated on their contention that Dr. Kracke's testimony was inadmissible. Since we have overruled the appellants' first and fourth points of error and related considerable evidence showing the nature and extent of Connie's injuries, we will not elongate this opinion by a further detailed account of the evidence. The jury awarded Connie $15,000 for future medical treatment. It is sufficient to state that the record shows that Connie will need to see Dr. Kracke for a period of two to four years. The doctor's hourly rate was $80. The doctor stated Connie would need to see him twice a week for two years or once a week for three or four years. Consequently, when we applied the above-stated standards for the determination of legal and factual insufficiency challenges, we must conclude that the evidence is both legally and factually sufficient to support the jury award of $15,000 for future medical treatment.

The jury awarded $10,000 for past pain and suffering and $10,000 for future pain and suffering. We pointed out above the nature and extent of Connie's injuries, the time she spent with her mother-in-law recuperating from her injuries, and the pain she endured in the process. Also, we further point out that Connie is still experiencing swelling in her left knee and pain related to her injuries. Thus, under the applicable standards of review, we conclude that the evidence is both legally and factually sufficient to support the jury's award for past and future pain and suffering.

The jury awarded $21,000 for loss of future earning capacity. The record shows Connie received a large cut on her head and suffered a severe concussion, has headaches, received a severe injury to her left knee, and has depression. She has undergone a noticeable personality change which caused her to be a very solemn person. Her knee occasionally swells and locks. She cannot run and be as active as she was before the accident. She is unable to lift as much weight (approximately forty pounds) as she could before the accident. She has not been able to achieve merit pay raises, and, co-workers have to help her with heavy work.

Before and after the accident, Connie worked as a nurse (L.V.N.). Before the accident, she was receiving approximately $7.00 per hour. After the accident, she has had cost of living pay increases and earns approximately $8.00 per hour. However, since the accident she has not been able to get overtime on her primary job. She has taken other less-paying work ($6.50 per hour) since she was unable to obtain overtime work. One of the physicians testified that Connie received approximately a ten percent permanent disability as a result of the knee injury. Charles Vance of the Texas Employment Commission testified that licensed vocational nurses generally make $6.00 to $8.00 per hour. Vance stated that Connie's ability to obtain and retain employment is restricted due to her physical condition.

■ At the time of trial, Connie was approximately 37 years of age. Before the accident she could reasonably expect to continue to work until age sixty-five (approximately twenty-eight years). The jury's award, in one sense, allowed a loss of earning capacity of approximately $750 per year. Even if we assume arguendo that Connie was making more money at the time of the trial than before the accident, that fact would not preclude her from recovering for loss of earning capacity. *See Mikell v. LaBeth*, 344 S.W.2d 702, 707 (Tex.Civ.App.—Houston 1961, writ ref'd n.r.e.). Consequently, under the applicable standards of review, we must conclude that the evidence is legally and factually sufficient to support the jury's award for loss of earning capacity. The appellants' second and third points of error are overruled.

By their fifth point of error, the appellants claim the trial court erred by rendering judgment for Connie because Connie's counsel committed improper and incurable argument to the jury by commenting on their failure to obtain an independent medical examination of Connie:

Now, if Mr. Besselman believes that his friend who he calls Bill Kracke is

trying to cheat Connie Gray out of money so he can treat her unnecessarily in the future, then don't you know that he would want a second opinion? And he could hire any objective witness he wanted to hire, and we would have to go and submit to an examination, and then he could get his second opinion.

Mr. Besselman: Your Honor, this is an improper jury argument. I object to it, and ask that the jury be instructed to disregard it.

The Court: Sustained.

Mr. Besselman: Would you please instruct the jury?

The Court: Ladies and Gentlemen, you are not to consider that. I again remind you, what the attorneys say is not evidence. It can not be considered by you as evidence.

Mr. Warner: There is no law that says that the defense can't present evidence if they disapprove of the evidence that has been presented, or if they have anybody on the face of the earth that disagrees with the testimony whether it be somebody else out at the hospital or a neighbor or whether it be another doctor. Did they bring anybody?

The first statement was promptly objected to, the objection was sustained, and the jury was instructed to not consider the argument. However, no specific objection was made to the first statement complained of, and there was no objection made to the second statement.

As the Court pointed out in *Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex.1979):

In the case of improper jury argument, the complainant must prove a number of things. He has the burden to prove (1) an error (2) that was not invited or provoked, (3) that was preserved by the proper trial predicate, such as an objection, a motion to instruct, or a motion for mistrial, and (4) was not curable by an instruction, a prompt withdrawal of the statement, or a reprimand by the judge. 3 McDonald, Texas Civil Practice § 13.-17.2 (1970). *There are only rare instances of incurable harm from improper argument.* The complainant has the further burden to prove (5) that the argument by its nature, degree and extent constituted reversibly harmful error. How long the argument continued, whether it was repeated or abandoned and whether there was cumulative error are proper inquiries. All of the evidence must be closely examined to determine (6) the argument's probable effect on a material finding. (7) *Importantly, a reversal must come from an evaluation of the whole case, which begins with the voir dire and ends with the closing argument.* The record may show that the cause is weak, strong, or very close. *From all of these factors, the complainant must show that the probability that the improper argument caused harm is greater than the probability that the verdict was grounded on the proper proceedings and evidence.* [emphasis added]

In this instance, when we review the record as a whole, the state of the evidence, the strength and weakness of the case, and the verdict, we must conclude that the jury carefully considered its verdict. Even though the jury made responses favorable to the appellee, the jury also made responses favorable to the appellants by refusing to award damages to the appellee for the loss of past household service and the loss of her future capacity to perform household services.

We are persuaded that the probabilities are that the jury would have reached its same conclusions from the evidence without regard to the challenged argument by counsel for appellee. Furthermore, both challenged statements were curable by an instruction from the court. The record shows an instruction to the jury to not consider the first statement; but, the record fails to show an objection to the second statement. Consequently, under the circumstances, even if we assume arguendo that the challenged arguments were error, they were not reasonably calculated to cause and probably did not cause the rendition of an improper judgment in the case. The appellants' fifth point of error is overruled.

In summary, the appellants' five points of error are overruled and the judgment of the trial court is affirmed.