681 F.2d 291
 Roger HAUGHT and Delores Haught, individually and as next
friends for their minor daughter, Jamie Marie
Haught, Plaintiffs-Appellants Cross-Appellees,
v.
John MACELUCH, M.D., Defendant-Appellee Cross-Appellant,
and
William C. Martin, M.D., Defendant-Appellee.
 No. 81-1103.
 United States Court of Appeals,
Fifth Circuit.
 July 26, 1982.
 
 Street, Swift, Brockermeyer, Bell & Ward, Kae L. Brockermeyer, Simon, Peebles, Haskell, Gardner & Betty, Anne Gardner, Fort Worth, Tex., for plaintiffs-appellants cross-appellees.
 Glasgow & Jones, Robert J. Glasgow, Stephenville, Tex., Paul J. Van Osselaer, Austin, Tex., for William C. Martin, M.D.
 Cantey, Hanger, Gooch, Munn & Collins, Estil A. Vance, Jr., Sloan Blair, Richard L. Griffith, Fort Worth, Tex., for Maceluch.
 Appeals from the United States District Court for the Northern District of Texas.
 Before CLARK, Chief Judge, THORNBERRY and GARZA, Circuit Judges.
 THORNBERRY, Circuit Judge:
 
 
 1
 In this medical malpractice suit, appellant Delores Haught claims that Dr. John J. Maceluch deviated from Texas' standards of sound medical practice in the delivery of her daughter, causing her daughter to suffer permanent brain injury. Appellant sued to recover damages for the impaired condition of her daughter, for medical expenses in connection with the child's birth and future care, for loss of the child's future earning capacity, and for appellant's own mental suffering over her daughter's impaired condition. The suit was filed under diversity jurisdiction in the Northern District of Texas, against Dr. Maceluch and Dr. William C. Martin, an alleged partner with Dr. Maceluch.
 
 
 2
 After a jury trial, the district court entered judgment of $1,160,000.00 for the child's medical expenses and $175,000.00 for her lost future earnings; the court deleted a jury award of $118,000.00 for appellant's mental suffering over her daughter's impaired condition. The court also refused recovery against Dr. Martin, although the jury had found him to be a partner by estoppel. Appellant now appeals the district court's deletion of her mental suffering damages and its refusal to hold Dr. Martin liable; Dr. Maceluch cross-appeals the jury verdict holding him liable for damages caused to the child by his alleged malpractice.
 
 I. The Facts
 
 3
 The complicated facts of this tragedy began in Weatherford, Texas, when appellant was referred to Dr. Martin for an examination just prior to her marriage and again when she later became pregnant. Appellant visited Dr. Martin for two or three months during her pregnancy, until Dr. Martin referred her to Dr. Maceluch; thereafter, she visited each of them alternatively, once a month in the beginning of her pregnancy and weekly at the end.
 
 
 4
 On March 12, 1977, when the childbirth was eleven days overdue, Dr. Maceluch examined appellant, but sent her home after he found no dilation of the cervix. The next day, appellant went into labor: at 10:00 p. m. she began having pains about three or four minutes apart. Because Dr. Martin was out of the country, appellant called Dr. Maceluch, who told her to go to the Campbell Memorial Hospital in Weatherford. Appellant arrived at the hospital at 10:30 p. m., and hospital personnel immediately called Dr. Maceluch to report that her cervix was not dilated and that her contractions were four minutes apart and moderate. At this point, Dr. Maceluch felt no necessity to go to the hospital himself. Hospital personnel again called Dr. Maceluch at midnight to report that appellant's contractions were four to five minutes apart and irregular; Dr. Maceluch ordered the nurse to admit and prepare appellant, but he still decided not to go to the hospital.
 
 
 5
 At 3:00 a. m. appellant's amniotic membrane ruptured spontaneously. The hospital's night supervisor noted that the escaped fluid contained dark green meconium-that is, the matter excreted in the baby's first bowel movement. Meconium staining is a symptom of fetal distress, indicating a compromise or interruption of the baby's oxygen supply.[1] Therefore, the night supervisor called Dr. Maceluch again to report the meconium staining; Dr. Maceluch again chose not to go to the hospital.
 
 
 6
 One hour later-at 4:00 a. m.-Dr. Maceluch called the hospital and ordered the nurses to place an external fetal heart monitor on appellant's stomach in order to measure the baby's heart rate. He also ordered the administration of a minimum dosage of Pitocin, a powerful drug used to stimulate a more regular labor contraction pattern; the Pitocin was supposed to induce labor, or to augment it, according to Dr. Maceluch. At 5:00 a. m. a nurse called Dr. Maceluch to report continued meconium staining and, in her reading of the external heart monitor, a loss of "beat to beat variability" in the relation of the fetal heartbeat to the appellant's contractions.[2] Both of these are symptoms of fetal distress. Dr. Maceluch, however, did not consider them reliable, so he did not go to the hospital.
 
 
 7
 Dr. Maceluch finally arrived at the hospital at 7:00 a. m. He observed continued gross meconium staining, and because he felt some doubt about possible loss of beat to beat variability, he removed the external fetal heart monitor and placed a more accurate internal fetal heart monitor on the baby's head. He also ordered the Pitocin dosage to be doubled. After noting that appellant's cervix was still dilated only one centimeter and that the baby's head was not yet engaged in appellant's pelvis, Dr. Maceluch left appellant and proceeded to make his morning rounds to other patients. In his absence, at 8:30 a. m., the nurses again increased the Pitocin dosage.
 
 
 8
 At approximately 8:00 a. m. the nurses noted the first sure signs of fetal heart deceleration, although it is not clear that they informed Dr. Maceluch. At about the same time-beginning at 8:10 a. m. according to the hospital records-Dr. Maceluch started to perform an elective hysterectomy on another patient. In the middle of this operation, though, a nurse interrupted him to tell him of the changes in the fetal heart beat. At this point, Dr. Maceluch decided that he would have to perform a Caesarian section on appellant; he therefore ordered the nurse to stop administering Pitocin to appellant and to have her moved to an operating room. He then proceeded to finish the elective operation.
 
 
 9
 At 9:00 a. m. appellant's husband signed a permit allowing Dr. Maceluch to perform a Caesarian section on appellant. Appellant was moved into the operating room at 9:10 a. m. and placed under anaesthesia at 9:25 a. m. Dr. Maceluch, who had finished his other operation at 9:15, finally came to appellant's aid, beginning the Caesarian section at 9:26 a. m. and completing it with the delivery of Jamie Marie Haught two minutes later at 9:28 a. m.
 
 
 10
 Upon delivery, Dr. Maceluch noted that the umbilical cord was wrapped three or four times around the baby's neck; he also found gross meconium covering the baby's body and in the baby's throat. These conditions confirmed Dr. Maceluch's pre-operative diagnosis of fetal distress. A nurse immediately intubated the baby to draw the meconium from the throat. Although the baby then began to breath spontaneously and its color returned, it was not in good general condition: its breathing suffered some retractions, its physical functions were depressed, and it exhibited poor muscle tone. Because of these problems, the baby was transferred to Fort Worth Children's Hospital for further treatment.
 
 
 11
 A neonatologist at Fort Worth Children's Hospital diagnosed the baby as suffering from severe perinatal asphyxia-that is, a severe deprivation of oxygen before, during, or after birth-and from meconium aspiration syndrome-the distress caused by inhalation of meconium into the lungs. The baby also suffered seizures, indicating damage to the brain. And the baby's pH level was quite low, an acidotic condition often caused by oxygen deprivation. Even more tragically, within three months the baby's head had shrunk because of the atrophy of her brain. According to the neonatologist, the brain damage was permanent and would necessitate continuing institutionalization for the child. In short, Jamie Marie Haught was doomed to a life limited by extraordinarily severe handicaps.
 
 II. Appellant's Mental Suffering
 
 12
 The most difficult issue that we must resolve in this case is whether appellant can recover for the mental anguish she suffered because of the birth of her child in a defective condition, as distinguished from appellant's suffering caused by the labor and delivery. The district court posed this question to the jury as follows:
 
 
 13
 Question No. 9 : What sum of money, if any, if now, paid in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate plaintiff, Delores Haught, for such injury as she sustained, if any, from the birth of Jamie Marie Haught in the birth defective condition proximately caused by the negligence, if any, of defendant Maceluch?
 
 
 14
 The jury answered by awarding appellant $118,000.00 as compensation. The district court, however, deleted this award on the ground that Texas law would not permit such recovery by an "uninjured bystander." But because we think that the Texas Supreme Court would allow appellant to recover on the compelling facts of this case, we reverse the district court and reinstate the verdict of the jury.
 
 A. The Texas Case Law
 
 15
 Of course, as a federal court exercising diversity jurisdiction, we are bound to follow the substantive law of Texas as declared by its Supreme Court. See Erie Railroad Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1783, 18 L.Ed.2d 886 (1967) ("(T)he underlying substantive rule involved is based on state law and the State's highest court is the best authority on its own law."). If, as in this case, there is no directly controlling decision by the Texas Supreme Court, then we must apply what we find to be the law of Texas after giving "proper regard" to all relevant rulings of the courts of Texas. In this respect, we may be said to be, in effect, sitting as a Texas court. See id. As such, we are "bound to determine and apply Texas law, a task requiring an examination of the decisions of the state's appellate courts." Cole v. Elliott Equipment Co., 653 F.2d 1031, 1034 (5th Cir. 1981).
 
 
 16
 Although the Texas Supreme Court has not yet rendered a decision that directly controls the "uninjured bystander" issue before us, it has decided cases relevant to the issue. In Hill v. Kimball, 76 Tex. 210, 13 S.W. 59 (1890), the Texas Supreme Court became one of the first courts to allow a plaintiff to recover for witnessing another's tortious conduct. The plaintiff in Hill suffered a miscarriage caused by a "strong emotion of the mind" when she witnessed the defendant's assault of two servants. The Court held the defendant liable under general negligence principles-that is, because the defendant's assault of the servants had been negligent toward the plaintiff. This basis for liability was a milepost in the law, since the prevailing rationale allowed recovery only when the defendant's actions were willful toward the bystander. See Hallen, Hill v. Kimball-A Milepost in the Law, 12 Texas L.Rev. 1, 14 (1934).
 
 
 17
 The Texas Supreme Court again allowed recovery for the negligent infliction of emotional distress in Gulf, C. & S.F. Ry. v. Hayter, 93 Tex. 239, 54 S.W. 944 (1900). The plaintiff in Hayter suffered "traumatic neurasthenia" after the train in which he was riding collided with another train. The Court held that recovery would be permitted "provided the act or omission is the proximate cause of the injury, and the injury ought, in the light of all of the circumstances, to have been foreseen as a natural and probable consequence thereof." Id. at 242, 54 S.W. at 945. The decision did not discuss recovery by a bystander, but it did confirm the applicability of general negligence principles to cases involving the infliction of emotional distress.
 
 
 18
 The bystander problem finally received attention in the Texas Supreme Court decision of Kaufman v. Miller, 414 S.W.2d 164 (Tex.1967). The Kaufman court denied recovery to a plaintiff who suffered a "conversion reaction neurosis" because of his fear for the safety of a person who had driven her car into the plaintiff's truck. The Court reasoned that while a plaintiff has a general right to recover for injuries from mental shock caused by negligent conduct, that right should not be unlimited: "Accordingly, some courts have imposed arbitrary limitations on the right. The limitations are generally keyed to foreseeability of consequences, whether foreseeability is treated as an element of negligence or an element of proximate cause." The Court discussed two such limitations, one of which forbade recovery by "one who suffers injury from mental shock as a result of an injury or threatened injury to a third person."[3] Several other factors also weighed against recovery, so the Court rendered judgment that the plaintiff take nothing. But the Court issued the following cautionary observation:
 
 
 19
 We recognize that this field of law is in a developing process, as is the field of psychiatry, and we would be reluctant to hold at this time that any one of the enumerated factors would of and by itself be sufficient to require a judgment denying liability. We are satisfied, however, that public policy is better served by denying liability when all are combined.
 
 
 20
 Id. at 171. The Texas Supreme Court therefore chose to deal with these claims on a case by case basis. Id.
 
 
 21
 Further guidance on the circumstances that would justify recovery for a bystander's emotional suffering has had to come from the Texas Courts of Civil Appeals. The most recent cases, decided after the landmark California case of Dillon v. Legg, 68 Cal.2d 728, 441 P.2d 912, 69 Cal.Rptr. 72 (1968),[4] have been unanimous in accepting the so-called modern rule announced in Dillon-namely, the rule that bystander recovery should be governed by general negligence principles. As we have already shown, this rule has firm roots in Texas Supreme Court jurisprudence, and the Courts of Civil Appeals have not hesitated to apply it as a rule of Texas law.
 
 
 22
 The most direct application occurred in Landreth v. Reed, 570 S.W.2d 486 (Tex.Civ.App.-Texarkana 1978, no writ), when the court allowed recovery for a girl who witnessed efforts to resuscitate her drowned sister, even though she apparently did not see the drowning. The court stated that "(a)lthough the exact question has not been definitely answered by a decision of our own courts, it appears that Texas will follow the modern rule, and will disregard the artificial distinctions in favor of a decision based upon those traditional concepts (of negligence and proximate cause based upon reasonable foreseeability)." 570 S.W.2d at 489. In support of this conclusion, the court cited the Texas Supreme Court decisions in Hill v. Kimball and Kaufman v. Miller and the California Supreme Court decision in Dillon v. Legg.
 
 
 23
 Similarly, in Bedgood v. Madalin, 589 S.W.2d 797 (Tex.Civ.App.-Corpus Christi 1979), rev'd on other grounds, 600 S.W.2d 773 (Tex.1980), the court allowed recovery for a father who, while standing in his back yard, heard a scream and a thud and who then ran out to the street to find that a car had fatally struck his son. The court agreed with Landreth that "Texas would follow the lead set by Dillon v. Legg and allow a bystander's recovery where a person's negligence causes manifested mental anguish which was foreseeable by the negligent party." 589 S.W.2d at 802 (citation omitted).[5]
 
 
 24
 Again, in Newman v. Minyard Food Stores, Inc., 601 S.W.2d 754 (Tex.Civ.App.-Dallas 1980), aff'd per curiam, 612 S.W.2d 198 (Tex.1980), the court applied the modern rule of Dillon v. Legg to allow as a jury issue a husband's claim for emotional distress caused by witnessing his wife's slip-and-fall accident. According to the court, "(i)f plaintiff is able to prove that an emotional injury occurred, the undisputed facts could support a finding of causal relation, and we are unable to hold, as a matter of law, that defendant could not reasonably have foreseen the consequences of its acts. Rather, this is a fact question which should be submitted to the jury." 601 S.W.2d at 755 (citation omitted). The court also noted that it could "not agree with defendant that this case presents, for the first time, a departure from the long standing rule in Texas concerning a cause of action asserted by an 'uninjured bystander.' " 601 S.W.2d at 755.[6]
 
 
 25
 Finally, in two other cases, the Courts of Civil Appeals concurred in the application of general negligence principles to bystander recovery. In Covington v. Estate of Foster, 584 S.W.2d 726, 728 (Tex.Civ.App.-Waco 1979, no writ), the court followed Landreth by interpreting Kaufman v. Miller to apply "the test of whether the injury was or should have been reasonably foreseeable to the defendant tort feasor." Thus, the court held "that the trial court erred in excluding plaintiffs' pleading, evidence and argument of the mental anguish and physical manifestations suffered by plaintiffs as a result of the injuries to their daughter." And in Dave Snelling Lincoln-Mercury v. Simon, 508 S.W.2d 923 (Tex.Civ.App.-Houston (1st Dist.) 1974, no writ), the court held that "(i)n our opinion, the questions discussed above (regarding bystander recovery) are properly determined upon the principles of foreseeability." The court therefore allowed a parent to recover for personal injury resulting from witnessing an injury to a child.[7]
 
 
 26
 This reading of the Texas case law clearly reveals that Texas will follow the modern rule of measuring bystander recovery according to the general negligence principle of foreseeability. The relevant Texas Supreme Court decisions have opened the door for such recovery, and the Texas Courts of Civil Appeals have generously accepted the invitation. Under these circumstances, we cannot refuse either; we must judge appellant's recovery in this case under the modern rule.[8] See Mott v. Mitsubishi International Corp., 636 F.2d 1073, 1074 (5th Cir. 1981) ("A decision of the Court of Civil Appeals is controlling on questions of state law in this court, absent strong indication that the Texas Supreme Court would decide the issue differently.").
 
 B. The Texas "Foreseeability" Test
 
 27
 While it is clear that Texas will allow bystander recovery to the extent that the bystander's injuries were foreseeable, it is less clear what the Texas courts mean when they use foreseeability as a test. We know only that the determination of foreseeability will depend on a number of factors and must be made on a case by case basis. See Kaufman v. Miller, supra, 414 S.W.2d at 168-71; Landreth v. Reed, supra, 570 S.W.2d at 489.
 
 
 28
 According to the Landreth court, three factors constitute the primary test for determining foreseeability. The court stated these factors as follows:
 
 
 29
 (1) whether the plaintiff was located near the scene of the accident; (2) whether the shock resulted from a direct emotional impact upon the plaintiff from a contemporaneous perception of the accident, as distinguished from learning of the accident from others after its occurrence; and (3) whether the plaintiff and the victim were closely related.
 
 
 30
 570 S.W.2d at 489. Accord Dillon v. Legg, supra, 68 Cal.2d 728, 441 P.2d 912, 69 Cal.Rptr. 72 (1968). And in fact, because the Texas Courts of Civil Appeals have so forthrightly adopted the modern rule established by Dillon v. Legg, the three factors as formulated by the Dillon Court become relevant. These factors are:
 
 
 31
 (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.
 
 
 32
 68 Cal.2d at 740-41, 441 P.2d at 920, 69 Cal.Rptr. at 80. "In light of these factors the court will determine whether the accident and harm was reasonably foreseeable. Such reasonable foreseeability does not turn on whether the particular defendant as an individual would have in actuality foreseen the exact accident and loss; it contemplates that courts on a case-by-case basis, analyzing all of the circumstances, will decide what the ordinary man under such circumstances should reasonably have foreseen." Id. at 741, 441 P.2d at 921, 69 Cal.Rptr. at 81 (emphasis in original). In short, "(t)he risk reasonably to be perceived defines the duty to be obeyed." Palsgraf v. Long Island R. R., 248 N.Y. 339, 344, 162 N.E. 99, 100 (1928) (Cardozo, J.).[9]
 
 
 33
 C. Were Appellant's Injuries Foreseeable?
 
 
 34
 When we apply the appropriate factors to determine the foreseeability of appellant's mental suffering in this case, we can come to no different conclusion than that drawn by the jury. All three of the factors of the modern rule counsel for a finding of foreseeability, precisely as the jury found. The district court therefore erred in deleting appellant's damages for mental suffering; rather, the award compensating appellant for the foreseeable consequences of Dr. Maceluch's negligent conduct should be allowed to stand.
 
 
 35
 Quite clearly, the facts of this case satisfy the first and the third factors of the modern rule. Not only was appellant located near the scene of the accident, she was in some sense the scene itself. Dr. Maceluch's negligent conduct was visited upon her and upon the child within her body; no closer proximity can be imagined. And the appellant and the victim were closely related-indeed, as a mother and child in childbirth their relationship was unitary.
 
 
 36
 The difficult question arises from the second factor. The district court found that appellant had not "contemporaneously perceived" the accident and therefore that the Texas courts would bar appellant's recovery as a matter of law. While this is a complex issue on the facts of this case, we must disagree with both parts of the district court's conclusion. Initially, we note that even in the absence of appellant's contemporaneous perception of the accident, the Texas courts would not necessarily bar appellant's cause of action. As the Texas Supreme Court stated in Kaufman v. Miller, "we would be reluctant to hold at this time that any one of the enumerated factors would of and by itself be sufficient to require a judgment denying liability." 414 S.W.2d at 171. Instead, we should deal "with cases of this type on a case by case basis." Id. Accord Dillon v. Legg, supra, 68 Cal.2d at 741, 441 P.2d at 920-21, 69 Cal.Rptr. at 80-81 ("The evaluation of these factors will indicate the degree of the defendant's foreseeability ... All these elements, of course, shade into each other; the fixing of obligation, intimately tied into the facts, depends upon each case.") (emphasis in original). Given the overwhelming strength of the proximity and relationship factors in this case, we think that a jury could find foreseeability even without the contemporaneous perception factor, or at least with weaker evidence of it. We think, in other words, that the unique facts of this case could easily lead to a finding of foreseeability regardless of the exact factors enunciated to express the modern rule, which is itself a rule of foreseeability and not of factors. Cf. Dillon v. Legg, supra, 68 Cal.2d at 740, 441 P.2d at 920, 69 Cal.Rptr. at 80 ("Since the chief element in determining whether defendant owes a duty or an obligation to plaintiff is the foreseeability of the risk, that factor will be of prime concern in every case.... We cannot now predetermine defendant's obligation in every situation by a fixed category; no immutable rule can establish the extent of that obligation for every circumstance of the future. We can, however, define guidelines which will aid in the resolution of such an issue as the instant one.") (emphasis added).
 
 
 37
 Moreover, we think that the Texas courts would find appellant to have contemporaneously perceived the accident. The district court held otherwise because it found that appellant "did not witness or even know of any injury to her daughter at the time of defendant's negligent act." But this finding misstates the inquiry. The correct question turns on whether the plaintiff had "an experiential perception of (the accident), as distinguished from a learning of it from others after its occurrence." Landreth v. Reed, supra, 570 S.W.2d at 490. In other words, the inquiry should focus more on the plaintiff's experiential perception of the accident, not just the injury, and should measure that perception in comparison to learning of the accident from others after its occurrence. Using this formulation of the question, the Texas Supreme Court would, we think, find a contemporaneous perception by a mother who experiences a negligently inflicted childbirth.
 
 
 38
 Of course, in the typical "uninjured bystander" case, the plaintiff has in fact seen both defendant's negligent act and the injury that it causes to the third person; in these cases, the Texas courts have had little trouble concluding that the plaintiff contemporaneously perceived the accident. See Hill v. Kimball, supra, 76 Tex. at 215, 13 S.W. at 60 (plaintiff saw defendant beating two individuals); Minyard Food Stores, Inc. v. Newman, supra, 612 S.W.2d at 755 (plaintiff saw his wife's painful slip-and-fall accident).
 
 
 39
 Other "uninjured bystander" cases, though, do not present this simple eyewitness scenario; nevertheless, the Texas courts have been willing to find contemporaneous perception. In Bedgood v. Madalin, supra, 589 S.W.2d at 802-03, the Court of Civil Appeals found that a father had contemporaneously perceived the automobile accident that killed his son, even though the father was standing in his back yard when the accident occurred on the street in front of his house. The father testified that he heard a scream and a thud "like a watermelon being dropped from a great height" and that he then ran through his house out to the street where he saw his son fatally injured. The court had "no difficulty with the fact that (the father) did not visually witness the accident, but rather heard it and then witnessed the results soon thereafter. His perception of the accident was still contemporaneous." Id. at 803.
 
 
 40
 In Landreth v. Reed, supra, 570 S.W.2d 486, the Court of Civil Appeals again found contemporaneous perception to allow recovery for a girl who witnessed efforts to resuscitate her drowned sister, even though the evidence was uncertain whether she saw her sister in the water. The court clearly stated the inquiry as we have articulated it above: "(i)n the modern view, actual observance of the accident is not required if there is otherwise an experiential perception of it, as distinguished from a learning of it from others after its occurrence." Id. at 490 (emphasis added). According to the court, "there was such a perception on the part of (the plaintiff). In seeing (the victim) brought from the pool in an emergency situation fraught with life or death drama, together with the traumatic shock of witnessing the desperate but unsuccessful attempts to save (the victim's) life, (plaintiff ) was brought so close to the reality of the accident as to render her experience an integral part of it. Such an experience is far different from the case where one seeks damages for his grief or agony at merely seeing the dead body of a loved one, or upon learning of the death from others after its occurrence." Id. (emphasis added).
 
 
 41
 Using these cases and their standards as guides, we think that we can consider appellant here to have contemporaneously perceived the accident which befell her daughter. Appellant was certainly "brought so close to the reality of the accident as to render her experience an integral part of it." Indeed, this Court can imagine no more integral an experience than that of a mother giving birth to a child through a protracted and difficult labor and delivery. Appellant here was conscious during more than eleven hours of painful labor. She perceived that something was wrong, wrong enough to cause her to fear for her child's life. She was aware of Dr. Maceluch's negligent acts, particularly his absence in a near-emergency situation and his over-administration of a powerful drug which caused distress to herself and to her child. In short, appellant had an "experiential perception" of the accident. Cf. Krouse v. Graham, 19 Cal.3d 59, 562 P.2d 1022, 137 Cal.Rptr. 863 (1977) (interpreting the contemporary observance requirement to include perception through any of the senses). The correctness of this conclusion becomes even more apparent when we note that appellant clearly did not learn of the accident from others after its occurrence; in fact, she perceived Dr. Maceluch's conduct for hours until he finally severed the bond between herself and the "third person."
 
 
 42
 Nor should the fact that appellant did not know the actual existence or extent of her child's injuries cause us to change this conclusion, lest we lose sight of the forest for the trees. Of course, the plaintiff's knowledge of the actual harm done to the third person will be a factor in favor of bystander recovery. But the ultimate test of recovery is the foreseeability of the plaintiff's emotional distress, which does not necessarily depend upon a single fact such as the plaintiff's contemporaneous perception of the injuries. Indeed, even in the typical "uninjured bystander" case the plaintiff often will not know the existence or extent of the victim's injuries. The mother who sees her child struck unconscious by a car does not know to any degree of medical certainty whether her child is actually injured; she knows only that an accident has befallen her child. Similarly here, appellant's disturbing experience informed her that some misfortune was happening to her child, causing her to fear for the child's life. Her distress, in other words, "resulted from a direct emotional impact upon (her) from a contemporaneous perception of the accident, as distinguished from learning of the accident from others after its occurrence." Landreth v. Reed, supra, 570 S.W.2d at 489.[10] Thus, on the facts before us, we find that appellant's emotional distress was foreseeable in light of her contemporaneous perception of the accident itself, in addition to her proximity to the accident and her close relationship to the victim. We must agree with the jury that the traumatic experience of a mismanaged childbirth quite reasonably causes the mother to suffer shocking thoughts about her child's safety, and we therefore allow compensation for the damages resulting from such suffering.
 
 III. Dr. Maceluch's Liability
 
 43
 We also agree with the jury that Dr. Maceluch should be held liable for all of the damages actually suffered by appellant and her child.[11] Dr. Maceluch contends that the district court erred by not granting his motions for directed verdict and judgment n.o.v. based on the insufficiency of the evidence to establish the applicable standard of medical care, as well as by not granting his motions for judgment n.o.v. and new trial based on the insufficiency of the evidence to prove that his acts proximately caused any of the injuries. But, as we will show below, neither of these contentions has merit.
 
 A. Standard of Medical Care
 
 44
 Before reaching the substance of Dr. Maceluch's argument, we note that the scope of our review of the district court's disposition of Dr. Maceluch's motions is limited. We will "consider all of the evidence, drawing all reasonable inferences most favorable to the party opposing the motion. We then must grant a motion for directed verdict or judgment n.o.v. only if the facts and inferences favor the movant so overwhelmingly that reasonable persons could not arrive at a contrary verdict." Schwartz v. Sears, Roebuck & Co., 669 F.2d 1091, 1093 (5th Cir. 1982).
 
 
 45
 The substance of Dr. Maceluch's claim depends upon the Texas rule regarding the standard of medical care against which Dr. Maceluch's conduct should be judged. The Texas rule reads as follows: "The burden of proof is on the patient-plaintiff to establish that the physician-defendant has undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances." Hood v. Phillips, 554 S.W.2d 160, 165 (Tex.1977). And the Texas courts have added that "(t)he circumstances to be considered include the state of medical knowledge at the time the complained of treatment was performed." Guidry v. Phillips, 580 S.W.2d 883, 887-88 (Tex.Civ.App.-Houston (14th Dist.) 1979, writ ref'd n.r.e.) (emphasis in original).
 
 
 46
 As Dr. Maceluch correctly observes, appellant's chief expert witness on medical standards-Dr. John Ray Baugh-did not specifically refer in his testimony to the standards applicable in March 1978, when appellant's tragic childbirth occurred. Indeed, Dr. Baugh often referred to "universal" standards of medical care. But contrary to Dr. Maceluch's assertion, this was sufficient to establish the applicable standard, in light of the circumstances of Dr. Baugh's testimony and of the other facts of this case. It is clear that Dr. Baugh knew the standard in effect for obstetricians in March 1978, since he had practiced obstetrics in Euless, Texas for thirteen years prior to the trial. He had visited the hospital in Weatherford approximately four months before the trial, and he testified that the facilities there were similar to those where he practiced in Euless and that they served a similar community. In fact, he noted that the fetal monitor used in Weatherford was the same apparatus used by him in Euless since 1964. He also testified that the "universal" standards which he used in formulating his opinions regarding Dr. Maceluch's level of medical care were simply "certain minimum safe and accepted standards of care," applicable "whether you are practicing obstetrics in a community of 10,000 or a community of 100,000." In short, Dr. Baugh testified that he had practiced obstetrics in a community and a hospital similar to Weatherford and its hospital in March 1978, and that the same standards of medical care applied to both places and indeed to all places. He thus showed his familiarity with the standard applicable in Weatherford in March 1978 and, we think, placed that standard before the jury. Of course, his testimony could have been more specific; nevertheless, our commonsense reading of the testimony convinces us that it showed Dr. Maceluch to have "undertaken a mode or form of treatment which a reasonable and prudent member of the medical profession would not have undertaken under the same or similar circumstances." Hood v. Phillips, supra, 554 S.W.2d at 165 (emphasis added).
 
 
 47
 In addition, we think that evidence independent of Dr. Baugh's testimony was sufficient to establish the appropriate standards of medical care. Dr. Maceluch himself testified about the medical standard in March 1978 regarding the timing for performing a Caesarian section:
 
 
 48
 Q. Now, the standard of care, Doctor, for obstetricians back in March of 1978, in Weatherford, Parker County, Texas, was to do a C-section if those two factors (loss of beat to beat variability and meconium staining) were present?
 
 
 49
 A. That was true.
 
 
 50
 Q. If you had known that these two factors were present, meconium staining and loss of beat to beat variability, if you had known they were present before 8:30, you would have done a C-section before then?
 
 
 51
 A. Yes.
 
 
 52
 Dr. Maceluch thus established the proper standard from his own testimony, allowing the jury to find that he breached the standard by failing to recognize the two crucial factors early enough. Cf. Williams v. Bennett, 610 S.W.2d 144 (Tex.1980) (permissible to establish the medical standard with the defendant's testimony alone). Similarly, the medical standard for the administration of Pitocin was established independently-without Dr. Baugh's testimony-by evidence from the Physician's Desk Reference and from the Weatherford hospital's rules. The 1978 Physician's Desk Reference specifically contraindicated the use of Pitocin when fetal distress is suspected-as, for example, when loss of beat to beat variability and meconium staining are present.[12] And the hospital rules at Campbell Memorial Hospital in March 1978 required that a doctor be immediately available when Pitocin is used to induce labor.[13] Both of these sources indicate a standard for Pitocin administration applicable in March 1978 in Weatherford, Texas. Faced with all of this evidence, we can only conclude that the correct standard of medical care was presented to the jury.
 
 B. Proximate Cause
 
 53
 Even if, as we find, the jury considered evidence of the appropriate medical standard and properly found it to have been breached, we cannot hold Dr. Maceluch liable unless his breach proximately caused the injuries to appellant and her child. Dr. Maceluch argues that the evidence presented at trial was insufficient to prove proximate cause and that the district court therefore should have granted his motions for judgment n.o.v. or for new trial.
 
 
 54
 Once again, we note that the scope of our review of the district court's denial of these motions is limited. As to the motion for judgment n.o.v., we will "consider all of the evidence, drawing all reasonable inferences most favorable to the party opposing the motion. We then must grant a motion for ... judgment n.o.v. only if the facts and inferences favor the movant so overwhelmingly that reasonable persons could not arrive at a contrary verdict." Schwartz v. Sears, Roebuck & Co., supra, 669 F.2d at 1093. "As to the denial of a motion for new trial, absent a clear showing of abuse of discretion, we will not disturb the District Court's action." Bunch v. Walter, 673 F.2d 127, 131 (5th Cir. 1982). And once again, we find that Dr. Maceluch cannot make the stringent showings necessary to call forth our intervention.
 
 
 55
 The evidence adduced at trial, viewed in a light most favorable to appellant, persuasively demonstrates that Dr. Maceluch's negligent conduct proximately caused the injuries to appellant and her child. Appellant's expert witnesses testified directly to that effect at trial. Two of these witnesses-Dr. Baugh and Dr. Heinz Eichenwald-specifically testified that during the childbirth appellant's child was undergoing current fetal distress, which Dr. Maceluch could have prevented by performing the Caesarian section earlier and could have lessened by not administering the Pitocin. Dr. Maceluch's expert witnesses testified otherwise, attacking the assumptions underlying the opinions of appellant's experts, but the jury chose not to believe them.[14] And after reviewing both sides of the testimony, we cannot say that the testimony of Dr. Maceluch's witnesses was overwhelming; reasonable persons could easily reach a verdict contrary to theirs. Nor can we say that the district court abused its discretion in denying a new trial. This was simply a case of conflicting expert testimony, in which "(i)t was the jury's province to weigh all of the evidence and to decide what credence should be given to the whole or to any part of the testimony of each witness." Lockley v. Page, 142 Tex. 594, 598, 180 S.W.2d 616, 618 (1944). See also Nash v. Verhalen, 330 S.W.2d 676 (Tex.Civ.App.-Texarkana 1959, writ ref'd n.r.e.).
 
 IV. Partnership by Estoppel
 
 56
 Finally, we must address appellant's claim against Dr. William C. Martin as a partner with Dr. Maceluch. Although the jury found that no legal partnership existed between Dr. Martin and Dr. Maceluch, they did find that a partnership existed by estoppel, as follows:
 
 QUESTION NO. 13:
 
 57
 A. Do you find by a preponderance of the evidence that defendant Martin represented to Delores Haught, orally, in writing, or in any other manner, that defendant Maceluch was his partner?
 
 
 58
 ANSWER: Yes.
 
 
 59
 B. Do you find from a preponderance of the evidence that Delores Haught detrimentally relied on such representation of partnership, if any, by defendant Martin.
 
 
 60
 ANSWER: Yes.
 
 
 61
 The district court, which had carried Dr. Martin's objection to these questions, then sustained the objection for lack of pleadings to support the issue of partnership by estoppel. The court also refused to allow appellant to amend her pleadings under Rule 15 to include an allegation of partnership by estoppel.
 
 
 62
 Appellant naturally challenges the district court's refusal of leave to amend. Of course, we can overturn that refusal only if the district court abused its discretion. Addington v. Farmer's Elevator Mut. Ins. Co., 650 F.2d 663 (5th Cir.), cert. denied, --- U.S. ----, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981). But because of the clear command of Rule 15(b), we find that the court did indeed abuse its discretion and that it should instead have allowed appellant to amend her pleadings to conform to the evidence presented at trial.
 
 
 63
 Rule 15(b) mandates that "(w)hen issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment...." Thus, if appellant's issue of partnership by estoppel was tried by express or implied consent, the district court should have considered it raised by the pleadings and should have allowed amendment upon appellant's request. The question is whether the issue of partnership by estoppel was so tried. It is obvious that the parties did not expressly consent to try this issue. They did, however, impliedly consent to do so: appellant introduced evidence relating to the issue of partnership by estoppel as part of her case-without any objection from Dr. Maceluch or Dr. Martin-and at the close of her case she announced that she was including the issue as part of her legal theory. See Wallin v. Fuller, 476 F.2d 1204 (5th Cir. 1973).
 
 
 64
 As a general rule, we can find implied consent when a party fails to object to evidence relating to issues that are beyond the pleadings. See 6 C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 1493 at 462-65. This finding, though, depends on the circumstances of each case, and in this case, Dr. Martin urges that two factors should be considered especially important. First, he argues that the evidence relating to the theory of partnership by estoppel was also relevant to the legal partnership theory; thus, the evidence did not alert him to the introduction of a new theory outside of the pleadings. It is true that "the introduction of evidence relevant to an issue already in the case may not be used to show consent to trial of a new issue absent a clear indication that the party who introduced the evidence was attempting to raise a new issue." International Harvester Credit Corp. v. East Coast Truck, 547 F.2d 888, 890 (5th Cir. 1977). But here the pertinent evidence "was much more strongly relevant to the (theory of partnership by estoppel), and this should have been apparent to defense counsel." Wallin v. Fuller, supra, 476 F.2d at 1210. The evidence was that appellant had relied on Dr. Martin's representation of his partnership with Dr. Maceluch:
 
 
 65
 Q. When Dr. Martin told you that he brought in a partner did you rely on the representation, that he had brought in a partner?
 
 
 66
 A. Yes, I did. I trusted him.
 
 
 67
 Since reliance is an element only of partnership by estoppel and not of legal partnership, this evidence alone should have been sufficient to notify Dr. Martin that appellant was pursuing a new issue. And even if it was not, appellant later gave Dr. Martin a "clear indication" that she was using the theory of partnership by estoppel. At the close of appellant's evidence, her counsel responded to Dr. Martin's motion for summary judgment by announcing the new theory:
 
 
 68
 (T)he fact that these parties (Dr. Martin and Dr. Maceluch), between themselves, did not actually intend to be partners does not, in this case, keep from establishing a partnership by estoppel. Specifically, Article 6131(b) (sic: Tex.Rev.Civ.Stat.Ann. art. 6132(b), § 16 (Vernon 1970)?) provides for liability of a partnership by estoppel when persons hold themselves out to the public as a partner and those acts are reasonably relied upon by the public. They are estopped from denying partnership. The cases held generally that partnership liability as to third persons is governed by the doctrine of estoppel and agency.
 
 
 69
 This unequivocally brought the new issue into the case with the awareness of all of the parties.
 
 
 70
 Dr. Martin then raises the second circumstance that he believes will prevent a finding of implied consent-namely, that the introduction of this new issue will prejudice him. See Wallin v. Fuller, supra, 476 F.2d at 1210 ("The possibility of prejudice to the opposing party may of course be reason to find a lack of consent to amendment under Rule 15(b)."). But we cannot see how any such prejudice could have occurred. Dr. Martin knew of appellant's new theory before he presented any of his evidence. And in fact, he testified at trial that he had never told anybody that he had a partnership with Dr. Maceluch; he stated three further times that he had never "represented" a partnership to appellant or to anyone else. Dr. Martin therefore had ample opportunity to prepare to meet the unpleaded issue, and he exercised that opportunity at trial. Under these circumstances, he was not prejudiced. Cf. C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 1493 at 467-69. This Court is thus firmly convinced that the district court abused its discretion by not finding implied consent to the issue of partnership by estoppel.
 
 
 71
 Once the finding of trial by consent has been made, there remains no discretion to deny appellant's motion to amend. See C. Wright & A. Miller, Federal Practice and Procedure: Civil, § 1493 at 469. In other words, the district court should have allowed the amendment as a matter of course. And even without the amendment, the issue of partnership by estoppel should be allowed to stand as the jury found it. Rule 15(b) specifically provides that issues tried by implied consent "shall be treated in all respects as if they had been raised in the pleadings," and further "that failure ... to amend does not affect the result of the trial of these issues." Because of this rule, we shall reinstate the finding of the jury that a partnership by estoppel existed between Dr. Martin and Dr. Maceluch as to appellant.
 
 
 72
 For all of the reasons discussed above, we AFFIRM IN PART AND REVERSE IN PART.
 
 
 
 [1]
 Meconium is the contents of the fetus accumulated during the fetus' gestation. It can be released as the fetus' first bowel movement when the oxygen supply to the fetus is compromised and, as a consequence, the fetus' sphincter muscles are relaxed. The meconium, which is sterile itself, is semi-solid and denser than the amniotic fluid into which it is excreted; over time, however, it gradually disperses and dissolves into the fluid. In addition, it gradually changes color, from its original green to brown or even yellow. Because of these changes, the consistency and color of the meconium can indicate the time of the episode of fetal distress
 
 
 [2]
 Beat to beat variability is a factor derived from the readings of the fetal monitor, which measures the fetus' heart rate and the mother's contractions over a period of time. The fetal monitor's measurements are displayed as a pair of continuous tracings on a strip chart, with the fetal heart rate drawn on top of the chart and the mother's contractions on the bottom. In a normal childbirth, the two "beat" measurements will vary-that is, the fetus' heart rate will be unaffected by the mother's contractions. If, however, the heart rate begins to fluctuate in direct correlation with the contractions, then fetal distress should be suspected. For example, the umbilical cord may be in such a position that the contractions compress it, causing an interruption of the fetus' oxygen supply and a corresponding alteration of the fetus' heart rate; the alteration of the heart rate would appear on the fetal monitor at a time corresponding to the contraction, thus indicating a loss of the normal beat to beat variability
 
 
 [3]
 The other limitation was based on the plaintiff's unusual susceptibility to mental injury-a factor not present in the case before us
 
 
 [4]
 In Dillon, the California Supreme Court rejected its prior "zone of danger" rule, which limited bystander recovery to those who witnessed negligent conduct while in a position to be harmed by that conduct. In applying general negligence principles, the Court found three factors to be relevant in allowing recovery: the bystander's physical proximity to the accident, the bystander's actual witnessing of the accident, and the relationship between the bystander and the victim. The Court stressed, however, that these factors were only guidelines, and that recovery would have to be determined on a case by case basis
 
 
 [5]
 On writ of error, the Texas Supreme Court reversed and remanded the father's claim on the ground that he had not properly pleaded the claim at trial. The Supreme Court "express(ed) no opinion as to the merits of this claim." 600 S.W.2d at 776
 
 
 [6]
 In its per curiam affirmance, the Texas Supreme Court "agree(d) with the judgment of the court of civil appeals that the trial court erred in granting summary judgment for Minyard. The question of mental anguish should be determined after a development of the fact." 612 S.W.2d at 198. The Texas Supreme Court thus seems to have accepted the "uninjured bystander" cause of action as a matter of general negligence law; in any event, it has clearly reaffirmed the existence of such a cause of action in some form
 
 
 [7]
 In addition, however, the court in Dave Snelling Lincoln-Mercury applied the traditional "zone of danger" test and found its conditions met, thus deciding the case on alternative grounds
 
 
 [8]
 Two commentators share this view that Texas has adopted the modern rule. See Lantry, An Expanding Legal Duty: The Recovery of Damages for Mental Anguish By Those Observing Tortious Conduct, 19 Am.Bus.L.J. 214, 219 n.15 (1981); Comment, Negligent Infliction of Emotional Harm to Bystanders-Should Recovery Be Denied?, 7 St. Mary's L.J. 560, 571 (1975)
 
 
 [9]
 The Texas case law also imposes another element-separate from the requirement of foreseeability-that limits recovery for emotional distress to those instances in which the distress manifests itself through physical injury. See Harned v. E-Z Finance Co., 151 Tex. 641, 254 S.W.2d 81 (1953); Fisher v. Carrousel Motor Hotel, Inc., 424 S.W.2d 627 (Tex.1967). Accord Capelouto v. Kaiser Foundation Hospitals, 7 Cal.3d 889, 892 n.1, 500 P.2d 880, 882 n.1, 103 Cal.Rptr. 856, 858 n.1 (1972) ("Dillon makes clear that a parent may recover for witnessing a child's distress only if the parent suffers actual physical injury."). However, as the district court correctly observed, "Texas courts have been somewhat liberal in defining what constitutes a 'physical injury.' ... (U)nder Texas law physical injury is not restricted to what is commonly thought of as physical injury-i.e., damage to some physical structure of the body-but extends to nervous disorders and physical and mental ailments resulting from objective fright or mental shock. Sutton Motor Co. v. Crysel, 289 S.W.2d 631 (Tex.Civ.App.-Beaumont 1956, no writ)." For example, in a leading case the Texas Supreme Court held that allegations of high nervousness, irritability, an upset stomach, loss of sleep, and an inability to perform previous employment were sufficient physical injury to support a cause of action. See Duty v. General Finance Co., 154 Tex. 16, 273 S.W.2d 64 (1954). Other cases decided by the Supreme Court have reached similar conclusions. See e.g., Gulf, C. & S. F. Ry. Co. v. Hayter, supra, 93 Tex. 239, 54 S.W. 944 (1900) (plaintiff's "traumatic neurasthenia" constituted sufficient injury); Houston Electric Co. v. Dorsett, 145 Tex. 95, 194 S.W.2d 546 (1946) (extreme nervousness, severe headaches, lapse of memory, and brain deterioration); Bailey v. American General Ins. Co., 154 Tex. 430, 279 S.W.2d 315, 318 (1955) ("anxiety neurosis"); St. Louis Southwestern Ry. Co. of Texas v. Alexander, 106 Tex. 518, 172 S.W. 709, 710 (1915) ("nervous trouble"). Under this standard, the district court correctly decided that appellant's injuries-depression, nervousness, weight gain, and nightmares-were more than mere fright and were indeed sufficient to constitute physical injury
 Moreover, we feel confident that appellant's injuries satisfy the purposes of the Texas physical injury requirement-namely, to prevent false claims and to limit claims to those involving serious emotional shock. This Court has no trouble in recognizing appellant's claim of emotional distress to be genuine and her emotional shock to be serious. To assert otherwise on the facts of this case would ignore the reality of the childbirth experience and of the relationship between mother and child.
 
 
 [10]
 This conclusion is buttressed even further, if somewhat more indirectly, by the reasoning of the California Supreme Court in Justus v. Atchison, 19 Cal.3d 564, 565 P.2d 122, 139 Cal.Rptr. 97 (1977). The Court in Justus, on facts quite similar to those in this case, denied recovery for the emotional distress suffered by a husband who had witnessed the negligently caused stillbirth experienced by his wife. According to the Court, two factors mitigated against recovery: First, the Court noted that the husband was a voluntary witness, unlike the involuntary witness presupposed in Dillon v. Legg-a factor that would not prevent recovery in the case before us. Second, the Court decided that the husband could not have contemporaneously perceived the accident or injury to a fetus still inside the wife's body. "(A)lthough (the) plaintiff was in attendance at the death of the fetus, that event was by its very nature hidden from his contemporaneous perception; he could not see the injury to the victim ... nor could he otherwise sense it.... To put it another way, he had been admitted to the theater but the drama was being played on a different stage." 19 Cal.3d at 584, 565 P.2d at 135, 139 Cal.Rptr. at 110
 The Court's description of this second factor leaves the clear implication that recovery could be allowed for the wife, since she could contemporaneously perceive the childbirth. By its very nature, the event of childbirth is not hidden from the mother's perception; even though she could not see the injury, she could otherwise sense it, at least for purposes of showing her emotional distress to be foreseeable. To put it another way, not only has the wife been admitted to the theater, she is also in some sense the stage upon which the drama is played. Cf. Austin v. Regents of the University of California, 89 Cal.App.3d 354, 152 Cal.Rptr. 420 (Cal.Ct.App.1979) (distinguishing Justus to allow recovery for a husband who felt life in his wife's unborn baby before the baby was stillborn).
 
 
 [11]
 As noted above, the jury awarded appellant $118,000.00 for her mental suffering caused by her child's impaired condition. The jury also awarded appellant's child $1,160,000.00 for medical expenses and $175,000.00 for lost future earnings
 
 
 [12]
 Dr. Maceluch contends that the Physician's Desk Reference standard cannot apply in this case because it refers only to current fetal distress, not to incidents of past fetal distress, as he claims the evidence shows here. His contention, however, argues not against the applicable standard-which the Physician's Desk Reference adequately establishes-but rather against the interpretation of the evidence to find current fetal distress. And after reviewing that evidence-consisting chiefly of testimony regarding fresh meconium staining and early loss of beat to beat variability-we find that it reasonably allowed an interpretation of current fetal distress. The evidence thus established both the standard of care for the administration of Pitocin and a breach of the standard by Dr. Maceluch
 
 
 [13]
 Dr. Maceluch again contends that this standard cannot apply here because it refers only to labor induction, not to labor augmentation, which he claims his procedure to have been. But again his contention actually counters only the evidence showing a labor induction-or showing the applicability of the hospital rule to this situation regardless of how Dr. Maceluch labelled it. Our review of the evidence, though, convinces us that the jury could reasonably have found both the standard and its breach
 
 
 [14]
 As noted above, these evidentiary assumptions involved primarily the evidence of fresh meconium staining and of early loss of beat to beat variability. This evidence, as well as Dr. Maceluch's rebuttal to it, was placed before the jury, and we find that they could reasonably choose to believe it