Mrs. Sylva B. POPE, Plaintiff-Appellee,

v.

ROLLINS PROTECTIVE SERVICES COMPANY, Defendant-Appellant,

v.

The ATLANTIC MUTUAL INSURANCE COMPANY, Intervenor-Appellee.

No. 82–2137.

United States Court of Appeals, Fifth Circuit.

April 22, 1983.

Rehearing Denied June 13, 1983.

198

Robert H. Singleton, Jr., Houston, Tex., for defendant-appellant.

Phillip A. Pfeifer, Houston, Tex., for Pope.

Robert H. Bateman, Houston, Tex., for Atlantic Mut.

Before WISDOM, RUBIN and TATE, Circuit Judges.

WISDOM, Circuit Judge:

This case explores the liability of a burglar alarm lessor and installer to the lessee when the alarm fails to operate because of tampering by burglars. At trial, the plaintiff prevailed and received trebled damages including an amount for her mental anguish. We affirm.

### Statement of the Case

In 1973, a representative of the defendant, Rollins Protective Services Co. (Rollins), communicated with the plaintiff, Sylva Pope, about the installation and leasing of burglar alarms. Pope was 60 years old, a widow, and lived alone. Following a visit and demonstration by a salesman at her home, Pope agreed to lease the Rollins system.

The system consisted of a master control unit, numerous battery powered wireless transmitters, a separate outdoor siren, and a "panic button". A transmitter would transmit electronic signals to the master control if the electronic contacts on the transmitter were disconnected or moved. If that occurred or if the panic button was pushed, the master control unit would activate three alarms. The first alarm, which sounded immediately, was a high-pitched tone called "sonalert" which could be heard inside but not outside the house. The second alarm was a loud separate siren outside the house that sounded for a period of 10 minutes. Finally, the master control unit would automatically dial Rollins's "central station" giving the name and location of the residence. The control station would then notify the Houston Police Department and a neighborhood police service. The latter two alarms would go off if the first alarm was not deactivated, by inserting a key into the master control unit, within 20 seconds. The panic button was a device that the customer could carry in her hand or purse, and would activate the three systems, even if the transmitters did not detect an intrusion. The Rollins representative, in selling Mrs. Pope on the system, told her that the average response time of the local police was from three to five minutes.

Testimony later showed that the so-called "central station" was an answering service with no special access to the police and would not even notify Rollins of an alarm call. Moreover, the average police response time in 1973 was twenty-six minutes.

When Rollins installed the system, Pope noticed that the wires running from the master control unit were installed outside the sheetrock wall in her broom closet and were visible if the door to the closet was open. Rollins's representative assured her that if the wires were cut all of the alarms would go off. Actually, if the wires to the individual alarms were cut, they would not operate. The system did not have an independent power source for the siren. If the wire to the outside siren was cut, there would be no way the siren could sound. There was evidence at trial that the Rollins representative knew that a burglar could disarm the alarms by cutting the wires running from the master control unit. Other evidence indicated that Rollins knew in 1978 that burglars in the Houston area were aware of this deficiency in the design of the burglar alarm system. About fifty times in 1978, Rollins went back to its customers to reinstall the wires behind the

walls. Rollins gave no warning to Pope about the deficiencies in the system.

On January 28, 1978, Mrs. Pope returned to her home around 7:00 p.m. When she opened the back-door to her house, she noticed the absence of the customary sound of the inside high-pitched sonalert alarm. This did not bother her, however, because the same thing had happened a month before because of low batteries for the transmitter on her back-door. Then she discovered that some of the wires running from her master control unit had been cut.[1] She ran from the house screaming. As she ran, she heard a scuffling sound behind her, so she pushed the panic button in her purse to set off the outdoor siren. The siren did not go off. The burglars, two men in ski masks, caught her outside the back door, brought her back into the house, threw her onto the floor of the utility room, and held a gun to her head while other burglars searched her house. She hit her head on the washer-dryer, and feigned unconsciousness. She remained on the floor twenty minutes with a gun to her head. During this time, the men took her watch and bracelet from her wrist, a pin from her scarf, and her wedding ring. One of the burglars ran his hands around her neck. They rifled her purse.

The burglars had entered Mrs. Pope's home through a glass door that was protected by a Rollins transmitter. They disarmed the Rollins system, however, by cutting the exposed siren and antenna wires at the master control unit. They did not cut the dialer telephone cable, however.

A neighbor of Pope's heard her scream and called the local police service. A security officer came to Pope's home, made a cursory inspection of the premises, but did not discover any evidence of the burglary. By the time he returned to the station, the pre-recorded telephone message had been delivered and he returned and discovered Pope. The burglars fled before the security officer returned.

Harry Caldwell, a former Chief of the Houston Police Department, testified that in his opinion, the only real function of a burglar alarm system is to scare the burglars away. He testified that the only effective deterrent to crime is a loud bell or siren. Such a system has no real value if the bell or siren does not work. Tim Pals, a former Rollins installer, who inspected Mrs. Pope's home after the burglary, concurred that the only portion of the Rollins system that was designed to protect Mrs. Pope (the siren) had been disarmed by the burglars. He also testified that having the wires installed in the wall would have made it more difficult to disarm the system in the twenty seconds before the siren would sound.

Pope tried her case to a jury. Pope testified that she had suffered severe anxiety because of her experience. She was unable to stay in her home until a new alarm system was installed. A psychiatrist testified that she suffered from chronic post-traumatic stress disorder as a result of her involvement in the life-threatening situation. The psychiatrist expected Pope's disability to continue for a number of years.

The jury found Rollins liable to Pope on several theories. It found that Rollins had misrepresented the characteristics of the alarm system in violation of § 17.46(b)(5) of the Texas Deceptive Trade Practices Act (DTPA). It found that Rollins had caused confusion regarding the telephonic feature of the system in violation of § 17.46(b)(3) of the DTPA. It found that Rollins had been grossly negligent in its installation and design of the burglar alarm system, and in failing to warn Pope that burglars could disarm the system. Finally, Rollins was held strictly liable to Pope because the jury found that Rollins had leased Pope a defective burglar alarm system. There was evidence from which the jury could have inferred that the operation of the siren would have warned Pope not to enter her home, or that the siren would cause the burglars to flee, or both. The jury awarded Pope $15,250 for loss of property, $150,000 for past

---

1. The burglars cut the wires that should have activated the indoor high-pitched alarm and the outdoor siren. They overlooked cutting the telephone dialer cable.

and future mental anguish, and $150,000 punitive damages for Rollins's gross negligence. The trial court granted Rollins's motion for judgment n.o.v. with regard to the punitive damages and trebled the other damage elements pursuant to the DTPA.

### Liability Under the Texas DTPA

At trial, Pope tried to show that Rollins's conduct breached the DTPA in two ways. First, Pope contended that Rollins misrepresented the system's ability to deter burglars and to operate if the wires running from the control unit were cut. Second, Pope maintained that Rollins deceived her when it told her that the recorded message relayed by the system would be received by Rollins personnel. Instead, an answering service received the message and notified the police. Pope contended that, had Rollins's employees received the message, they would have relayed the message more quickly. She testified that had Rollins told her the truth about the effectiveness of the alarm system and the message relay procedure, she would not have agreed to lease the system.

The jury considered the evidence and returned special verdicts pertaining to the elements of Pope's DTPA claim. The jury found that Rollins represented to Pope that its burglar alarm system had "characteristics, uses or benefits" that it did not have.[2] The jury also found that Rollins had caused "confusion or misunderstanding" regarding its affiliation with the answering service. Finally, the jury found that the misrepresentations and confusion were producing causes of Pope's mental anguish.

On appeal, Rollins argues that Pope presented no evidence or, at most, insufficient evidence that its representations were producing causes of her mental anguish. Moreover, Rollins contends that the DTPA does not allow her to recover damages for her mental anguish. We hold that the trial court did not err in allowing Pope to recover under the DTPA.

At the time the system was installed and at the time of the incident, before amendment in 1979, Tex.Bus. & Com.Code Ann. § 17.50 (Vernon Supp.1978) provided, in relevant part:

(a) A consumer may maintain an action if he has been adversely affected by:

(1) the use or employment by any person of an act or practice declared to be unlawful by Section 17.46 of this subchapter . . . .

(b) In a suit filed under this section, each consumer who prevails may obtain:

(1) three times the amount of actual damages plus court costs and attorney's fees reasonable in relation to the amount of work expended . . . .

Section 17.46 provided, before the 1979 amendments:

(a) False, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

(b) The term "false, misleading, or deceptive acts or practices" includes, but is not limited to, the following acts: . . .

(3) causing confusion or misunderstanding as to affiliation, connection, or association with, or certification by, another; . . .

(5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not; . . .

One of the primary reasons for the enactment of the DTPA was to provide consumers with a remedy for deceptive trade practices without the burdens of proof and numerous defenses encountered in a common law fraud or breach of warranty action. *Smith v. Baldwin,* Tex.1980, 611 S.W.2d 611,

---

**2.** The jury found that Rollins has misrepresented the attributes of the alarm system: (1) by representing that the alarm system would provide safety and security from intrusion into her residence; (2) by representing that the Houston Police Department would be dispatched within three to five minutes; and (3) by representing that the outside siren would sound even if the wires from the master control unit to the siren were cut.

616; *Woo v. Great Southwestern Acceptance Corp.,* Tex.App.1978, 565 S.W.2d 290, 298. In keeping with the broad legislative purpose, § 17.44 provides:

> This subchapter shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection.

*See United Postage Corp. v. Kammeyer,* Tex.Civ.App.1979, 581 S.W.2d 716, 723; *Rinehart v. Sonitrol of Dallas, Inc.,* Tex.Civ. App.1981, 620 S.W.2d 660, 662.

Despite the legislature's expansion of liability for those who use deception to generate business, a putative plaintiff still must show that the deceptive trade practice caused his damage. *Marshall, Tex. v. Bryant Air Conditioning,* 5 Cir.1981, 650 F.2d 724, 727. Although the pre-1979 version of § 17.50 referred to consumers who have been "adversely affected by" a deceptive trade practice,[3] Texas courts have construed that term to mean that the unlawful practice must have been a "producing cause" of the plaintiff's injury.[4] *See American Transfer & Storage Co. v. Brown,* Tex. Civ.App.1979, 584 S.W.2d 284, 294–96, *rev'd on other grounds,* Tex., 601 S.W.2d 931 *cert.*

denied, 1980, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474; *O'Shea v. I.B.M., Corp.,* Tex. Civ.App.1979, 578 S.W.2d 844, 847; *Charping v. Light,* Tex.Civ.App.1979, 578 S.W.2d 462, 464; Curry, The 1979 Amendments To The Deceptive Trade Practices—Consumer Protection Act, 1980, 32 Baylor L.Rev. 51, 60; Goodfriend and Lynn, Of White Knights and Black Knights: An Analysis of the 1979 Amendments to the Texas Deceptive Trade Practices Act, 1979, 33 Sw.L.J. 941, 979 n. 219; *cf.* Note, Special Issue Submission in Cases Controlled by the Texas Deceptive Trade Practices Act: Spradling v. Williams, 32 Sw.L.J. 1043, 1046.

The parties agree that Pope had to show that Rollins's representations were a producing cause of her mental anguish to succeed under the DTPA. The trial court gave the following instruction on the definition of producing cause: "The term producing cause means an efficient, exciting or contributing cause, which in a natural sequence, produces the injuries or damages complained of, if any, and without which the injury would not have occurred." Rollins does not challenge this instruction. It contends instead that the jury had no, or alternatively, insufficient evidence before it to find that Rollins's misrepresentations were a producing cause of Pope's injuries. According to Rollins, it is pure conjecture to

---

**3.** The 1979 amendments to the DTPA replaced the term "adversely affected by". As amended, the relevant part of § 17.50 reads: "A consumer may maintain an action where any of the following constitute *a producing cause* of actual damages: . . ." (emphasis added). The Senate debate on this change indicated that the substitution of "producing cause" for "adversely affected by" reflected the widely accepted construction of the latter term by the courts as the equivalent of the former term. *See* Goodfriend and Lynn, Of White Knights and Black Knights: An Analysis of the 1979 Amendments to the Texas Deceptive Trade Practices Act, 1979, 33 Sw.L.J. 941, 979 n. 217; Curry, The 1979 Amendments To The Deceptive Trade Practices—Consumer Protection Act, 1980, 32 Baylor L.Rev. 51, 60.

**4.** The distinction between producing cause and proximate cause is an important one for Rollins. Under Texas law, proximate cause has two elements; cause-in-fact and foreseeability. *Farley v. M M Cattle Co.,* Tex.1975, 529 S.W.2d

751, 755. Foreseeability is not an element of producing cause, however, *C.A. Hoover and Son v. O.M. Franklin Serum Co.,* Tex.1969, 444 S.W.2d 596, 598; *see* Goodfriend and Lynn, 33 Sw.L.J. at 980. In the portion of its brief devoted to Pope's claims under negligence and strict liability theories, Rollins attacks the jury's findings of proximate cause. The company argues that the presence of intervening wrongdoers, the burglars in this case, is dispositive of the proximate causation issue. *But see Abdallah v. Caribbean Security Agency,* 3d Cir. 1977, 557 F.2d 61, 63 & n. 3. An illegal intervening act would not affect the proximate cause inquiry only if that act were foreseeable. *Abdallah,* 557 F.2d at 63; *Austin v. Schmedes,* Tex.1955, 279 S.W.2d 326, 331; *McCane-Sondock Protection Systems, Inc. v. Emmitte,* Tex. Civ.App.1976, 540 S.W.2d 764, 765. We need not consider the foreseeability of the burglars in this case, however, because the proper causation standard under the DTPA is producing cause.

assume that truthfulness on their part would have caused a different outcome in the burglary at the Pope home.

■ When this Court considers an appellant's allegations of insufficient evidence underlying a special jury verdict, the court must review the evidence in a light most favorable to the appellee. *Maxey v. Freightliner Corp.,* 5 Cir.1982, 665 F.2d 1367, 1371 (*en banc*); *see Boeing Co. v. Shipman,* 5 Cir.1969, 411 F.2d 365, 368–70 (en banc). The court must consider all the evidence, but in a light and with all reasonable inferences supporting the challenged finding. *Maxey,* 665 F.2d at 1371. The evidence presented at trial showed that Pope was concerned about the location of the wires running from the master control unit when Rollins installed the unit. She testified that if she had known that a burglar could disable the system by cutting the master control unit wires or that an answering service would receive the recorded message instead of Rollins employees, she would not have leased the Rollins system. She testified that the outside siren feature of the Rollins system was the most appealing feature to her. She also testified that her physical security was the biggest motivation for her initial and continuing relationship with Rollins. She testified that she pushed her "panic button" as the burglars chased her, but to no avail. There was evidence that other systems available to Pope had design features and back up power systems that insured that all components would continue to function if the wires were cut. Finally, the evidence showed that an operating outdoor alarm virtually always makes burglars flee.

■ After hearing this evidence, the jury easily could have found that Rollins's misrepresentations were a producing cause of her injury. If she had known of the malfunction that snipping the exposed wires would cause, the jury could have assumed that she would have had the wires run behind the wall or installed a more effective system. If the burglars had been able to gain entry without activating the siren, Pope would have achieved that result when she pushed her panic button. Once the siren sounded, the jury could assume that Pope's assailants would have fled. Even if no system were installed, the jury could have inferred from her overriding concern for her own safety that she would have taken some steps to insure her physical security. In any event, the natural result of Rollins's misrepresentations was Pope's reliance on a deficient system and the exploitation of those deficiencies by burglars to her detriment. The jury finding on the producing cause issue is supported by the evidence in the record.

Rollins's second contention is that Pope is not entitled to recover for her mental anguish under the DTPA, as a matter of law. Section 17.50 of the DTPA provides for the recovery of "actual damages". The Texas Supreme Court has construed the term "actual damages" as those damages that are recoverable at common law. *Brown v. American Transfer & Storage Co.,* Tex., 601 S.W.2d 931, 939, *cert. denied,* 1980, 449 U.S. 1015, 101 S.Ct. 575, 66 L.Ed.2d 474. Under the Texas common law, "[d]amages for mental anguish cannot be recovered absent a showing of an intentional tort, gross negligence, willful and wanton disregard, or accompanying physical injury." *Farmers & Merchants State Bank v. Ferguson,* Tex. 1981, 617 S.W.2d 918, 921; *see Duncan v. Luke Johnson Ford,* Tex.1980, 603 S.W.2d 777, 779. According to Rollins, Pope has failed to show any of the circumstances enumerated in the common law rule and, therefore, she is not eligible to recover damages for her mental anguish under the DTPA.

Pope argues that she can recover for her mental anguish for several reasons. First, she contends that her condition during and after the assault in her home comes within the definition of a physical injury under Texas law. Second, she relies on Rollins's knowledge of similar malfunctions in its system as evidence that Rollins acted in a willful or grossly negligent manner. Third, she argues that she comes within a recognized exception to the common law rule because the focus of the contractual rela-

tionship was the promotion of her peace of mind and Rollins should have foreseen the mental anguish that would result from a breach of its contractual duty. Finally, according to Pope, the common law rule, as originally adopted in Texas, allows for recovery for mental anguish in cases involving any property damage.

To establish that her case qualifies as physical injury under Texas law, Pope directs this Court's attention to the evidence presented regarding her assault and her condition after the burglary. After the burglars caught her as she ran from her home, they dragged her back into the house and threw her onto the floor in her utility room. As we previously noted, when she fell, she bumped her head on her washer and dryer and feigned unconsciousness for the twenty minutes that the burglars stayed in the house. She was on the floor in constant fear while one of the burglars stood over her with a pistol to her head and the other searched her for valuables.

Immediately following the incident Pope was hysterical. She was unable to live in her house again until a new alarm system was installed seven weeks later. Her personality changed after the assault. A friend testified that Pope was noticeably nervous and withdrawn after the assault, and had trouble sleeping. A neighbor testified that Pope exhibited nervousness for more than a year after the burglary, and repeatedly requested him to investigate noises in her house and accompany her when she came home alone at night.

Pope called as an expert Dr. James Claghorn, a board certified psychiatrist and assistant professor of psychiatry at Baylor College of Medicine. Claghorn's examination of Pope revealed that, after her life-threatening situation, she experienced extreme insecurity and anxiety that forced her to take elaborate precautions to feel secure. At one point her anxiety caused severe weakness, bordering on paralysis, in her legs requiring her hospitalization. Claghorn diagnosed her condition as post-traumatic stress disorder, a recognized condition similar to battle fatigue.

■ We find that Pope has shown sufficient evidence of physical injury to recover damages for her mental anguish. The common law rule requiring a showing of physical injury as a prerequisite for an award for mental anguish stems from a judicial concern for the difficulty of administering a more liberal rule.

. . . [M]ental anguish, standing alone, is too subtle and speculative to be measured by any known legal standard; mental anguish and its consequences are so intangible and peculiar and vary so much with the individual that they cannot reasonably be anticipated, hence they fall without the boundaries of any reasonably proximate causal connection with the act of the defendant; a "wide door" might thereby be opened not only to fictitious claims but to litigation over trivialities and mere bad manners as well; and, finally, since mental anguish can exist only in the mind of the injured party, not only its extent but its very existence can be established only by the word of the injured party, in the absence of some objective injury.

*Harned v. E–Z Finance Co.,* Tex.1953, 151 Tex. 641, 254 S.W.2d 81, 85; *see* W. Prosser, Law of Torts 329 (4th ed. 1971). The question then becomes what level of "objective injury" is required before a defendant becomes liable for the mental distress he has caused. Or, put in the context of the case at hand, do Pope's ailments rise to the level of physical injury? We find that they do.

In the recent case of *Haught v. Maceluch,* 5 Cir.1982, 681 F.2d 291, we considered the meaning the Texas courts give to the term physical injury. Our reasoning in that case applies equally here:

"Texas courts have been somewhat liberal in defining what constitutes a 'physical injury.' . . . [U]nder Texas law physical injury is not restricted to what is commonly thought of as physical injury—i.e., damage to some physical structure of the body—but extends to nervous disorders and physical and mental ailments resulting from objective fright or mental shock. *Sutton Motor Co. v. Crysel,* 289 S.W.2d

631 (Tex.Civ.App.—Beaumont 1956, no writ)." For example, in a leading case the Texas Supreme Court held that allegations of high nervousness, irritability, an upset stomach, loss of sleep, and an inability to perform previous employment were sufficient physical injury to support a cause of action. *See Duty v. General Finance Co.,* 154 Tex. 16, 273 S.W.2d 64 (1954).[5]

*Haught,* 681 F.2d at 279 n. 9. In addition to the same sort of symptoms experienced by the plaintiff in *Haught,* Pope's anxiety manifested itself in a more tangible way, a

weakness in her limbs that resulted in her hospitalization. Moreover, her condition was severe enough to be diagnosed by a psychiatrist as post-traumatic stress disorder, a condition recognized by the American Psychiatric Association. Based on all of the evidence regarding Pope's condition following her assault, we hold that she had a physical injury for purposes of the common law rule governing recovery for mental anguish.[6] Since her damages are recoverable under the common law, they are recoverable under the DTPA.[7] *Brown,* 691 S.W.2d at 939. Our finding that Rollins's liability

**5.** Continuing, we said:

Other cases decided by the Supreme Court have reached similar conclusions. *See e.g. Gulf, C. & S.F. Ry. Co. v. Hayter, supra,* 93 Tex. 239, 54 S.W. 944 (1960) (plaintiff's "traumatic neurasthenia" constituted sufficient injury); *Houston Electric Co. v. Dorsett,* 145 Tex. 95, 194 S.W.2d 546 (1946) (extreme nervousness, severe headaches, lapse of memory, and brain deterioration). *Bailey v. American General Ins. Co.,* 154 Tex. 430, 279 S.W.2d 315, 318 (1955) ("anxiety neurosis"); *St. Louis Southwestern Ry. Co. of Texas v. Alexander,* 106 Tex. 518, 172 S.W. 709, 710 (1915) ("nervous trouble"). Under this standard, the district court correctly decided that appellant's injuries—depression, nervousness, weight gain, and nightmares—were more than mere fright and were indeed sufficient to constitute physical injury.

Moreover, we feel confident that appellant's injuries satisfy the purposes of the Texas physical injury requirement—namely, to prevent false claims and to limit claims to those involving serious emotional shock. This Court has no trouble in recognizing appellant's claim of emotional distress to be genuine and her emotional shock to be serious.

*Haught,* 681 F.2d at 279 n. 9.

**6.** Because we hold that the physical manifestations of Pope's mental anguish were enough to satisfy the common law rule, we need not determine whether the physical aspects of her encounter with the burglars, such as her bumping her head or the burglars groping for jewelry, constitute a "physical injury". It is worth noting, however, that Texas law permits recovery for the mental anguish that results from battery even where there is no injury to the physical structure of the plaintiff's body and the only contact between the plaintiff and defendant is slight. *Fisher v. Carrousel Motor Hotel, Inc.,* Tex.1967, 424 S.W.2d 627, 629–30.

Similarly, because of our holding above, we need not address the other theories Pope ad-

vances as support for her recovery of damages for mental anguish under the DTPA.

**7.** We find additional support for our holding in the Texas legislature's express desire that the DTPA be given an expansive reading. *See* Tex. Bus. & Com.Code Ann. § 17.44 (Vernon Supp. 1982). Considering the evidence that Pope repeatedly expressed her concern for her personal safety and that Rollins misrepresented the effectiveness of its system and did nothing to remedy the deficiencies in the system or warn Pope when it learned that the criminal community had begun to exploit those deficiencies, our holding furthers the purposes of the DTPA.

Some commentators have said that the legislative history of the 1979 amendments to the DTPA renders future mental anguish debates moot. The Texas Senate's proposed amendments to the DTPA included a definition of actual damages. The House of Representatives deleted the definition. The House version of the amendments, with no definition of actual damages, was enacted into law effective August 27, 1979. The deletion prompted the following exchange in the House:

Gibson [of Ector]: ... Would [the term actual damages] include any damages that were incurred by the plaintiff such as mental anguish?

Hill [of Potter]: ... It would include any damages that you could convince the jury had occurred as a result of a violation of the Deceptive Trade Practices Act.

Gibson: ... So, in other words, any damages involving mental anguish, any damages that were consequential from the act of the defendant would be included in your amendment, is that correct?

Hill: That's right.

Some commentators have inferred from this colloquy that mental anguish is an element of damages in all DTPA actions filed after the effective date of the amendments. Mayer and Stanberry, Damages for Mental Anguish Under the Deceptive Trade Practice Act: Are They Recoverable?, 1981, 44 Tex.B.J. 1193, 1196.

may be grounded in the DTPA precludes the need to discuss the other bases of liability found by the jury.

### Reduction of Damages

Rollins contends that, even if the jury was correct in holding Rollins liable to Pope, we should reduce the amount of damages awarded. Rollins advances two reasons for the reduction. First, it argues that the amount of damages is controlled by the liquidated damages provision of the contract with Pope. Second, Rollins considers the damages awarded for Pope's mental anguish excessive as a matter of law.

The contract between Rollins and Pope provided that Rollins's liability resulting from the actions of its employees would be limited to $250.[8] The trial court held that this provision did not limit Rollins's liability to Pope because the contract between the parties was void. The district court based its decision on Rollins's failure to notify Pope, at the time she entered the contract, of her right under the Texas Home Solicitation Act (THSA), Tex.Rev.Civ.Stat.Ann. art. 5069–13.02 (Vernon Supp.1982), to cancel the contract within three days. Under the THSA, failure to give notice of the right to cancel the contract renders the agreement "void and unenforceable". *Id.* art. 5069–13.03(b).

Rollins does not deny that it has violated the express provisions of the THSA. It argues, instead, that by failing to enforce the liability limitation provision of the contract, the district court applied the THSA in a way never intended by the Texas legislature. It is axiomatic that where a statute is clear and unambiguous on its face, a court will not look to legislative history to alter the application of the statute except in rare and exceptional circumstances. *Rubin v. United States,* 1981, 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633, 639; *Glenn v. United States,* 5 Cir.1978, 571 F.2d 270, 271; *General Electric Co. v. Southern Construction Co.,* 5 Cir.1967, 383 F.2d 135, 138. We see no rare and exceptional circumstances in this case.[9] Even if we accepted Rollins's contention that the district court has dictated a harsh result, harshness alone would not necessitate an examination of the legislative history underlying the THSA. *United States v. Second Nat. Bank of North Miami,* 5 Cir. 1974, 502 F.2d 535, 540, *cert. denied,* 1975, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777; *Woodson v. Califano,* S.D.Tex.1978, 455 F.Supp. 457, 458. Rollins violated the provisions of the THSA, and it must suffer the sanctions contained within that Act.

Rollins also contends that the district court abused its discretion in refusing to reduce the amount of the jury's verdict for Pope's mental anguish. The jury awarded Pope $150,000 for her mental anguish. The trial court trebled that amount pursuant to § 17.50(b) of the DTPA. The trebling of damages under the DTPA is

---

8. The relevant provision of the "Installation-Service Contract" read:

The parties agree that if loss or damage should result from the failure of performance or operation or from defective performance or operation or from improper installation or servicing of the System, that Rollins' liability, if any, for the loss or damage thus sustained shall be limited to a sum equal to ten (10%) percent of one year's service charge or $250.00, whichever sum is the greater, and that the provisions of this paragraph shall apply if loss or damage, irrespective of cause or origin, results, directly or indirectly to persons or property from performance or nonperformance of obligations imposed by this Agreement or from negligence, active or otherwise, of Rollins, its agents or employees.

9. One such "rare and exceptional" circumstance occurs when a literal reading of a statute would plainly frustrate the legislature's purpose in passing the statute. *Bohannon v. Manhattan Life Ins. Co.,* 5 Cir.1977, 555 F.2d 1205, 1209. The district court's reading of art. 5069–13.02 does not frustrate the intent of the Texas legislature. The purpose of the THSA was to "provide protection to customers purchasing goods, services, or realty in which the merchant or person acting for him engages in a personal solicitation of the sale to the consumer at the residence of the consumer". *McDaniel v. Pettigrew,* Tex.App.1976, 536 S.W.2d 611, 614. In this case, our holding will protect Pope from a limitation contained in a contract presented to her in her home. This result furthers, rather than frustrates, the legislative purpose behind the THSA.

mandatory. *Woods v. Littleton,* Tex.1977, 554 S.W.2d 662, 671. Thus, in determining whether the jury verdict was grossly excessive, we can examine only the base award of $150,000.

After considering Rollins's motion to reduce the amount of the judgment, the trial court stated that although the award was generous, it was not so excessive or shocking to the judicial conscience that it required reversal. We, too, will not reverse the jury's verdict unless the award is so large that it shows passion or prejudice or shocks the judicial conscience. *See Perricone v. Kansas City Southern Ry.,* 5 Cir. 1980, 630 F.2d 317, 320; *Wiley v. Stensaker Schiffahrtsges,* 5 Cir.1977, 557 F.2d 1168, 1171, *cert. denied,* 1978, 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792. The damages awarded here do not shock our conscience.

The jury heard testimony concerning Pope's condition and they observed the witnesses and the plaintiff during the course of examination and cross-examination. Damages for mental anguish are, by their very nature, subjective and the jury has a much better opportunity than this court to determine the extent of the plaintiff's injury. Absent gross excessiveness not present in this case, we accept the monetary measure the jury assigns to that subjective damage. *Cf. Fenslage v. Dawkins,* 5 Cir.1980, 629 F.2d 1107, 1109, 1110 (Court affirmance of exemplary and compensatory damage award of $130,000 for mental anguish of mother wrongfully deprived of custody of child).[10]

The judgment is AFFIRMED.

---

**10.** Because Pope failed to cross-appeal with regard to the trial court's judgment n.o.v. on the issue of Rollins's gross negligence, we need not address that ruling. Fed.R.App.P. 4(a); *see Duriso v. K-Mart No. 4195,* 5 Cir.1977, 559 F.2d 1274, 1278.